Joshua Van DANZI, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–02–00151–CR.

Court of Appeals of Texas,
El Paso.

March 27, 2003.

Stephanie Michelle Duecker, Richardson, for Appellant.

Tom O'Connell, Criminal Dist. Atty., McKinney, for appellee.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## *OPINION*

SUSAN LARSEN, Justice.

Joshua Van Danzi was charged with possession of a criminal instrument and theft of property valued between $50 and $500. After a bench trial, he was convicted, sentenced to 180 days of confinement, and ordered to pay a $1,000 fine for each offense. In this opinion, we review his conviction for possession of a criminal instrument.[1] Because the evidence is legally insufficient to sustain this conviction, we reverse the judgment of conviction and render a judgment of acquittal.

### The Standard of Review

To determine whether the evidence is legally sufficient, we view the evidence in the light most favorable to the prosecution to determine whether a rational fact finder could find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). The fact finder, here the trial judge, is the sole judge of the weight of the evidence and the credibility of the witnesses. *Levario v. State*, 964 S.W.2d 290, 294 (Tex. App.-El Paso 1997, no pet.).

### The Evidence

Danzi was charged with intentionally and knowingly possessing a criminal instrument, namely, a slim jim, with intent to use it in the commission of an offense, namely, burglary of a motor vehicle. *See*

TEX. PEN.CODE ANN. § 16.01(a)(1) (Vernon 2003). As relevant to this charge, the following evidence was adduced at trial.

Plano Police Officer Ronald Kress testified that he was dispatched to backup another officer who was investigating an apparent burglary of a motor vehicle. While he was on his way, Officer Kress observed a vehicle a couple of streets away that was going ten to fifteen miles per hour in a thirty-mile-per-hour zone. The vehicle came to a full stop at an intersection with a stop sign, but it failed to stop behind the solid white line. Officer Kress pulled the vehicle over. Danzi was the driver of the car and Jerry Payne was a passenger. Officer Kress recognized Danzi because he had previously assisted in arresting him for possession of criminal instruments.

A total of four other officers eventually arrived at the scene of the traffic stop. A K–9 officer conducted a narcotics sniff. After the dog alerted, the officers conducted a thorough search of the vehicle.

Officer Kress described the results of the search as follows:

Q   What did you discover, if anything, during your search of Mr. Danzi's vehicle?

A   Items were located in the trunk and recovered that were later determined to be stolen property from the burglary [at the other location]. Also located in the trunk of the vehicle were criminal instruments frequently used to conduct BMVs, or burglary of motor vehicles.

Q   Can you describe the criminal instrument that you're talking about?

A   Yes, ma'am. It's a slim-jim.

The slim jim was admitted into evidence. Officer Kress later testified that the offi-

1. We have affirmed Danzi's theft conviction in a separate opinion. *See Danzi v. State*, No. 08-02-00150-CR, 2003 WL 1564240 (Tex. App.-El Paso March 27, 2003, no pet. h.) (not designated for publication).

cers also found two types of screwdrivers and a flashlight.[2]

A written statement made by Danzi was admitted into evidence without objection. In it, Danzi reported that Payne called him and asked if he wanted to go car-jacking. Danzi told him "no but that if he got me a car stereo that I would buy it from him." At around 2 a.m., he went to Payne's house and Payne showed him a car stereo, car amplifier, and big box with two subwoofers. They put the stereo in Danzi's trunk and headed for Danzi's girlfriend's house. While they were on their way, Payne told Danzi to "drive by where he jacked it." The statement also recites, "The tools in my care [sic] were not used by Jerry Payne to break into any vehicles. The slim jim was used by me 5 months ago to get my fiancé's keys out of her car.... Jerry Payne had used a spark plug to break into the vehicles."

At trial, Danzi reiterated that Payne called him and told him he had a stereo for him to consider and that on the way to Danzi's girlfriend's house, Payne suggested that they drive by the car where Payne had gotten the stereo. He testified that a couple of weeks earlier he had locked his keys in his car at the carwash. His girlfriend bought the slim jim at an Auto Zone and the owner of the car wash used it to retrieve his keys. He attempted to explain the inconsistency between this version of events and the version presented in his written statement by saying that both he and his girlfriend have a slim jim. He stated that the other tools were in his car because he works at a mechanic shop. One of the police officers testified that while he was transporting Payne to jail, Payne explained why he and Danzi were driving around in the area. Payne told

him that "they were coming back into the area to possibly hit a white Mercedes...."

## The Statute

Resolution of Danzi's sufficiency challenge depends on the interpretation of section 16.01 of the Texas Penal Code. We quote the statute in full below, italicizing the portions most relevant in this case.

(a) *A person commits an offense if:*

　(1) *he possesses a criminal instrument with intent to use it in the commission of an offense;* or

　(2) with knowledge of its character and with intent to use or aid or permit another to use in the commission of an offense, he manufactures, adapts, sells, installs, or sets up a criminal instrument.

(b) *For the purpose of this section, 'criminal instrument' means anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense.*

(c) An offense under Subsection (a)(1) is one category lower than the offense intended. An offense under Subsection (a)(2) is a state jail felony.

TEX. PEN.CODE ANN. § 16.01 (Vernon 2003) (emphasis added).

Section 16.01 was first construed by a federal district court. *See Universal Amusement Co. v. Vance,* 404 F.Supp. 33 (S.D.Tex.1975), *vacated in part on other grounds sub. nom Butler v. Dexter,* 425 U.S. 262, 96 S.Ct. 1527, 47 L.Ed.2d 774 (1976), *aff'd in relevant part, Universal Amusement Co. v. Vance,* 559 F.2d 1286, 1293–1300 (5th Cir.1977). In *Universal,* the court stated that the statute is "not

---

**2.** The officers testified that they found some marijuana and marijuana seeds as well. But they did not retain the marijuana or the seeds.

Officer Kress did not believe the marijuana was a usable quantity, but the K–9 officer believed it was.

aimed at an instrument which has lawful uses...." *Id.* at 48. The court further stated:

> The statute ... is clearly drawn and very specific.... *The statute was obviously designed to deal with a very small class of property which can be used only for the commission of crime* and to deal with persons in possession of such property or engaged in the manufacture of adaptation of the property exclusively for use in criminal activities, before the criminal activities are undertaken or completed.

*Id.* at 51 (emphasis added).

A year after *Universal* was decided, the Texas Court of Criminal Appeals was called on to determine whether the statute is unconstitutionally vague, indefinite, and overbroad. *See Fronatt v. State,* 543 S.W.2d 140, 142 (Tex.Crim.App.1976). The court quoted the above language from *Universal* and stated, "We subscribe to the views stated in *Universal,* and decline to hold [the statute] unconstitutional on the bare allegations that it is vague, indefinite and overbroad." *Id.*

In the ensuing years, appellate courts applied the *Universal/Fronatt* interpretation of the statute. Courts held that the statute applied when the instrument could be used only for the commission of a crime, *see, e.g., Simmons v. State,* 690 S.W.2d 26, 28–29 (Tex.App.-Beaumont 1985, no pet.) (homemade key that could be used only to burglarize coin-operated machines); *Carrasco v. State,* 712 S.W.2d 623, 625 (Tex.App.-Corpus Christi 1986, no pet.) (wire with a loop at the end specially designed for burglarizing vehicles), but that it did not apply when the instrument was not specially designed or adapted for use in a crime, *see, e.g., Nobby Lobby, Inc. v. City of Dallas,* 970 F.2d 82, 90 (5th Cir.1992) (video, audio, and computer equipment used for showing allegedly obscene videotape); *Harris v. State,* 790 S.W.2d 778, 780 (Tex.App.-Houston [14th Dist.] 1990, pet. ref'd) ("lockband key" that could be used to open electric meter for lawful purposes).

Three appellate courts have attempted to define the proper application of section 16.01. The Third Court of Appeals analyzed the statute in *Eodice v. State,* 742 S.W.2d 844 (Tex.App.-Austin 1987, no pet.). The court held:

> In order to be a criminal instrument within the meaning of the statute, it is not enough that an object can be used to commit a crime. Rather, the object must be one that, as designed, made, or adapted, is distinctively or peculiarly suited to accomplishing a criminal objective. While the opinion in *Universal Amusement* may have overstated the point by suggesting that the commission of a crime must be the *only* use for a criminal instrument, it is certainly clear from the statutory definition that the commission of a crime must be the object's *primary* purpose.

*Eodice,* 742 S.W.2d at 846 (footnote omitted).

The court reversed a conviction involving the following facts. The defendant was standing in the doorway of a closed pawn shop at 2 a.m. Inside his car were a feeler gauge, circuit tester, and bent cotter pin. Inside his socks were a filtered-lens flashlight and a pry bar. *Id.* at 845. Although there was evidence that some of these instruments could be used to commit burglary, there was no evidence that any of the instruments were specially designed, made, or adapted for that use. *Id.* at 847. The court rejected the State's argument that the defendant had specially adapted the flashlight and pry bar for use in a burglary by hiding them in his socks, noting that concealment of these instruments did not alter their nature. *Id.* The court

concluded that the defendant's "concealment of these objects is evidence of his intent to use them to commit burglary, a separate element of the charged offense, but is not evidence that these items had been specially adapted for that purpose." *Id.*

In *Ex parte Andrews*, the First Court of Appeals echoed the Third Court's distinction between proof of intent to commit a crime and proof that the instrument was designed, made, or adapted for that purpose. 814 S.W.2d 839 (Tex.App.-Houston [1st Dist.] 1991, pet. dism'd). The court held:

> [T]he gravamen of the offense ... is the physical adaptation of the alleged instrument for a specific criminal intent.... We find that any illegality to be proved is in the inherent characteristics of the object itself as adapted, and not in the conduct of defendants in using the object within a particular criminal episode. An object does not become a criminal instrument by the context of its use, but by the limited nature and specialized criminal use of its own distinctive properties.

*Id.* at 841. Applying this holding to the case before it, the court reversed the convictions of abortion protesters who used bicycle locks and chains to lock themselves together. *Id.* at 840, 842. The court noted that "[u]nder the State's theory, any instrument, otherwise lawful, would be a criminal instrument if used in any way to facilitate the commission of a crime...." *Id.* at 842.

The Fourteenth Court of Appeals has interpreted section 16.01 inconsistently with *Eodice* and *Andrews*. *See Janjua v. State*, 991 S.W.2d 419 (Tex.App.-Houston [14th Dist.] 1999, no pet.). The court began its analysis by tracing the history of section 16.01. The statute was derived from an earlier statute that prohibited fel-

ons from possessing certain objects, such as machines, jimmies, tools, false keys, and pick-locks, "or other implements or things adapted, designed or commonly used" to commit burglary or safecracking. Act of May 30, 1963, 58th Leg., R.S., ch. 254, § 1, 1963 Tex. Gen. Laws 691, 691. Comparing the language of this former statute to section 16.01, the court concluded that the Legislature apparently intended to expand the scope of the former statute. *Janjua*, 991 S.W.2d at 423.

The court stated that, contrary to this legislative intent, *Universal* construed section 16.01 "so narrowly as to extinguish its practical application." *Id.* The court recognized that in *Fronatt* the Texas Court of Criminal Appeals expressly approved of *Universal's* statement limiting application of section 16.01 to instruments that can be used *only* for the commission of a crime. But the court concluded that *Fronatt* is no longer controlling because the statute was amended after *Fronatt* was decided. *Id.* at 423–24. When *Fronatt* was decided, section 16.01(b) did not contain the language "the possession, manufacture, or sale of which is not otherwise an offense." *See* Act of June 14, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 912. Before this language was added, section 16.01 appeared to criminalize the possession of contraband, such as silencers and drug paraphernalia, that was already made illegal by other statutes. *Janjua*, 991 S.W.2d at 423. Noting that the statute no longer applies to illegal contraband, the court found it "almost impossible to conceive of an object which may be lawfully possessed, but has no legitimate use." *Id.* at 424. Therefore, the court determined that under the amended statute, "criminal instrument" is not limited to objects that can be used only for criminal purposes. *Id.*

Having concluded that it was not bound by *Universal* or *Fronatt,* the court proceeded to reject Eodice's interpretation of section 16.01 as well. The court believed that *Eodice* presented the exact type of scenario envisioned by the Legislature when it adopted section 16.01. *Id.* at 424–25. And, in stark contrast to *Andrews,* the court held that "the gravamen of the crime remains the actor's *intended use* of the instrument." *Id.* at 425. *Contra Andrews,* 814 S.W.2d at 841 (holding that the gravamen of the offense is the physical adaptation of the instrument). The court concluded that "the ontological essence of what constitutes a criminal instrument under Section 16.01 must be determined by both (1) its design or adaptation and (2) the facts and circumstances establishing its intended use." *Janjua,* 991 S.W.2d at 426.

Finally, the court applied its interpretation of section 16.01 to the facts of the case before it. The defendant had been convicted of promoting child pornography, and the State sought to seize and destroy "criminal instruments" used in the crime. A personal computer was among the instruments marked for forfeiture. The State presented evidence that the computer contained a device for converting moving video images into still photographs and that numerous files had been created on the hard drive to organize and store pornographic images. *Id.* at 426. The court held that this evidence established that the computer had been specially adapted to facilitate the offense of promoting child pornography, and that the computer was therefore a criminal instrument. *Id.* at 426–27. *But cf. Nobby Lobby,* 970 F.2d at 90 (noting that it is possession of an obscene movie that evinces an intent to display illegal material and that possession of a projector is irrelevant). The court limited its holding somewhat by stating that the word "specially" in the statute

means that "the object must be a fundamental or critically important element in the commission of the intended offense." *Janjua,* 991 S.W.2d at 427 n. 13.

The State urges us to follow *Janjua* and to consider the suspicious circumstances under which the slim jim was discovered in determining whether it is a criminal instrument. We readily agree that these suspicious circumstances provide sufficient evidence to support a finding that Danzi had the intent to commit an offense. But we decline to follow *Janjua* for several reasons.

First, and most importantly, it is inconsistent with what we consider to be binding precedent of the Texas Court of Criminal Appeals. Although section 16.01 has been amended since *Fronatt* was decided, the amendments do not affect the holding of that case. *Janjua* placed particular emphasis on the 1975 amendment to section 16.01(b). That amendment excepted from the definition of a "criminal instrument" any instrument "the possession, manufacture, or sale of which is not otherwise an offense. . . ." Act of June 19, 1975, 64th Leg., R.S., ch. 342, § 7, 1975 Tex. Gen. Laws 912, 913–14. Approximately one month before it decided *Fronatt,* the Court of Criminal Appeals decided *Ex parte Harrell,* 542 S.W.2d 169 (Tex.Crim.App. 1976). In *Harrell,* the defendant was convicted under section 16.01 for possessing a forged prescription. 542 S.W.2d at 169–70. The court held that he should have been charged under a more specific statute that criminalized possession of a forged writing. *Id.* at 173. Thus, the court effectively excepted instruments that were already rendered illegal by other statutes from the purview of section 16.01, and the 1975 amendment of the statute merely codified this exception. Therefore, when the court decided *Fronatt,* it was not laboring under the assumption that the statute ap-

plied to possession of objects rendered illegal by other statutes.

Second, we do not consider it "almost impossible to conceive of an object which may be lawfully possessed, but has no legitimate use." *Janjua,* 991 S.W.2d at 424. Resourceful miscreants may design or make unique, homemade objects, or adapt existing ones, to suit their criminal purposes. *See, e.g., Simmons,* 690 S.W.2d at 28–29 (homemade key designed to burglarize coin-operated machines). The Legislature cannot foresee what these objects might be. The Legislature may have intended section 16.01 to cover possession of these objects, which would otherwise go unpunished.

Third, we are not convinced that the Legislature intended section 16.01 to be construed more broadly, in all respects, than the statute it replaced. Under the plain language of the former statute, it applied to objects "commonly used" to commit burglary or safecracking. But under section 16.01, objects must be "specially designed, made, or adapted for use in the commission of an offense." "Commonly used" allows for broader application than "specially designed, made, or adapted." *See Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App.1991) (holding that courts must generally give effect to the plain meaning of a statute because that is the best evidence of the Legislature's intent).

We also note that the practice commentary appended to section 16.01 when it was first enacted indicates that the Legislature did not intend section 16.01 to be construed broadly. *See Devine v. State,* 786 S.W.2d 268, 270 (Tex.Crim.App.1989) (gleaning legislative intent from a practice commentary). The practice commentary provides:

> Section 16.01 attaches criminal responsibility at a point even earlier than the attempt section. . . . It aims at terminating incipient criminal activity, the existence of which is indicated by conduct involving a 'criminal instrument.' The mere possession or manufacture of things specially designed for the purpose of accomplishing a criminal objective is strong evidence of criminal intent. The instrument must be *specially* designed, made, or adapted for the commission of an offense, however; things frequently used in crime, but which have common, lawful uses, are excluded from the purview of Section 16.01 because possession of such things, alone, is conduct too ambiguous for imposition of the criminal sanction. In addition, the section requires proof of specific intent to use the instrument possessed in committing an offense.

Searcy & Patterson, Practice Commentary, 1 Texas Penal Code Annotated § 16.01 (Vernon 1974), *quoted in Eodice,* 742 S.W.2d at 846. The authors' emphasis on the word "specially" suggests that the Legislature intended a narrow construction of what constitutes a criminal instrument.

Finally, *Janjua* conflates two separate elements of the statute. The statute forbids possession of "a criminal instrument with intent to use it in the commission of an offense." Thus, to be guilty of this offense, a person must (1) possess a criminal instrument, and (2) have the intent to use it in the commission of an offense. But rather than treating intent as a separate element, *Janjua* folds intent into the definition of "criminal instrument." *See* 991 S.W.2d at 426 (holding that what constitutes a criminal instrument is determined by both its design or adaptation and its intended use). We agree with *Eodice* and *Andrews* that intent is a separate element of the offense. *See Andrews,* 814 S.W.2d at 841 ("An object does not become a

criminal instrument by the context of its use, but by the limited nature and specialized criminal use of its own distinctive properties."); *Eodice,* 742 S.W.2d at 847 (holding that intent is a separate element and evidence relating to intent is irrelevant to determining whether an object is a criminal instrument).

### Sufficiency of the Evidence

We turn, then, to the record to determine whether there was any evidence from which a rational fact finder could determine that the slim jim was "specially designed, made, or adapted for use in the commission of an offense."[3] TEX. PEN. CODE ANN. § 16.01(b). The only evidence that relates to this issue is Officer Kress's testimony that a slim jim is a "criminal instrument[ ] frequently used to conduct BMVs, or burglary of motor vehicles." We conclude that this evidence is legally insufficient.

We find support for our conclusion in cases construing analogous statutes that criminalize possession of a club. *See* TEX. PEN.CODE ANN. §§ 46.01, 46.02 (Vernon 2003). "Club" is defined as an instrument that is "specially designed, made, or adapted for the purpose of inflicting serious bodily injury or death...." *Id.* § 46.01(1). Construing this statute, the Texas Court of Criminal Appeals has held, "[t]he fact that an object is capable of inflicting serious bodily injury or death alone" is insufficient. *Alexander v. State,* 617 S.W.2d 269, 270 (Tex.Crim.App. [Panel Op.] 1981). The court reversed a conviction because there was no evidence that the purported club was specially designed, made, or adapted for that purpose. *Id.* Similarly,

proof that an object is frequently used in crime does not equate with proof that it was specially, designed, made, or adapted for that purpose. *See* Searcy & Patterson, Practice Commentary, 1 Texas Penal Code Annotated § 16.01 (Vernon 1974).

In another case construing the definition of "club," the Court of Criminal Appeals refused to infer from a police officer's description of an instrument as a "club" that the instrument was specially designed, made, or adapted for the purpose of inflicting serious bodily injury or death. *See Meza v. State,* 652 S.W.2d 399, 400–01 (Tex.Crim.App.1983). Similarly, the fact that Officer Kress called the slim jim a "criminal instrument" is insufficient to sustain the conviction.

The State argues that the slim jim is analogous to the lock pick that was deemed to be a criminal instrument in *Fronatt.* In *Janjua,* the court noted, "Even the criminal instrument found in Fronatt, *i.e.,* a lock pick, is a legitimate tool in the hands of a locksmith." *Janjua,* 991 S.W.2d at 423. The State asserts that although the slim jim, like the lock pick, may have had a legitimate purpose in the hands of a locksmith, its purpose in the hands of Danzi was clearly criminal. We acknowledge that the *Fronatt* court did not recite any direct evidence that the lock pick could be used only for a criminal purpose. However, a police officer testified that the lock pick was designed to unlock a particular type of lock. *Fronatt,* 543 S.W.2d at 142. He also testified that the pick was functional based on his many years of experience specializing in coin-operated machine burglaries and observation of similar lock-picking devices. *Id.* at

---

**3.** Danzi's testimony indicates that the slim jim could be used for lawful purposes. He testified that it was purchased at an Auto Zone and was used to unlock either his car or his girlfriend's car. But the trial judge, who was the sole judge of the credibility of the witnesses, apparently did not credit this testimony. Given our standard of review, we will not consider this testimony.

143. The court apparently considered this some evidence from which the trial judge could infer that the lock pick was specially designed for the commission of coin-operated machine burglaries. In this case, we have no evidence regarding the slim jim's design. We also note that because *Fronatt* was an appeal from the revocation of probation, the court applied an abuse of discretion standard to the trial judge's decision, rather than the *Jackson v. Virginia* standard that we must apply here. *See id.*

### Conclusion

Having determined that the evidence is legally insufficient, we reverse the judgment of conviction and render a judgment of acquittal.