**Opinion filed February 14, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00174-CR

_____

## JUAN JOSE GUERRA, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 385th District Court**

**Midland County, Texas**

**Trial Court Cause No. CR37347**

## O P I N I O N

Juan Jose Guerra appeals his conviction by a jury of the offense of unlawful use of a criminal instrument with the intent to commit the offense of aggravated kidnapping or aggravated sexual assault. The jury also found that Guerra used or exhibited a deadly weapon, a firearm, during the commission of the offense. The jury assessed his punishment at twenty years in the Texas Department of Criminal Justice, Institutional Division. Guerra asserts in three issues on appeal that (1) the trial court erred when it denied his motions to suppress evidence obtained from the initial stop of his vehicle and subsequent detention, (2) the evidence is

insufficient to support his conviction, and (3) the trial court erred when it denied his requested jury instruction at the conclusion of the guilt-innocence phase of the trial. We affirm.

Guerra contends in Issue Two that the evidence is insufficient to support his conviction. We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); and *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under this standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Section 16.01(a) of the Texas Penal Code provides that a person commits an offense if:

(1) the person possesses a criminal instrument or mechanical security device with the intent to use the instrument or device in the commission of an offense; or

(2) with knowledge of its character and with the intent to use a criminal instrument or mechanical security device or aid or permit another to use the instrument or device in the commission of an offense, the person manufactures, adapts, sells, installs, or sets up the instrument or device.

TEX. PENAL CODE ANN. § 16.01(a) (West Supp. 2012).

The statute defines "criminal instrument" as "anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense." *Id.* § 16.01(b)(1).

Nancy Chiszar testified that she is a Deportation Removal Assistant under the Immigration Customs Enforcement (ICE) Division of the United States Department of Homeland Security. She indicated that between 8:30 or 9:00 p.m. on April 28, 2010, as she and her husband were coming back from having dinner, she noticed a gray vehicle coming out of a parking lot near her place of employment. Chiszar said she became concerned when the gray vehicle, driven by a single male, pulled in behind her and her husband and, after they pulled into the parking lot of her office, continued down the street at a very slow speed. She asserted that she was concerned because two or three weeks earlier a fellow agent was followed home.

Chiszar testified that she was also concerned because of the BOLO alerts, which were "be-on-the-lookouts" her office received from its El Paso headquarters. She noted that an

2

employee of the consulate had just been shot in Ciudad Juarez. Chiszar also mentioned that there were Latin Kings in the area.

Chiszar testified that she and her husband, René Arturo del Villar, pulled out of her office parking lot and followed the vehicle. She said the vehicle made a stop and then pulled over to the curb. She indicated that they passed the vehicle when it pulled over.

Chiszar expressed her concern that, because the windows of the vehicle were not tinted, it might be a rented vehicle. She said she was concerned that maybe the occupant of the vehicle was observing her office building and wanted to retaliate since "we had this previous information that had happened." Chiszar related that, when she and her husband returned to her office parking lot, the vehicle followed behind them and returned to the parking lot where they had first observed it.

Chiszar noted that the vehicle was parked facing her building. She said that, when she "got down," the driver of the vehicle turned his bright lights on. She indicated that she got the attention of another agent, Tim Stone, by banging on the back door of her building.

Chiszar testified that she told Agent Stone about the vehicle and asked him to stop it and find out what was going on. She indicated that she literally pulled him out of the building. She said that the vehicle left the parking lot when she pointed it out to Agent Stone.

Chiszar testified that Agent Stone followed the vehicle after it exited the parking lot and turned north. She noted that the building where the vehicle had been parked was vacant, without any business in the building. She also pointed out that the vehicle was not far away when it turned on its bright lights. She identified Guerra as the man whom Agent Stone stopped. She said she called the Midland Police Department for backup.

On cross-examination, Chiszar acknowledged that there was nothing on her office building that would show that it is a government building. She also acknowledged that she did not know how long the vehicle had been parked when she first saw it. She agreed that there was nothing about the vehicle she saw exiting the parking lot connecting it to a prior incident in which someone had been followed home. She acknowledged that there was nothing on her vehicle to indicate that she was an employee of the Immigration Service or that her husband was a border patrol agent and that neither she nor her husband was wearing anything that would indicate their employment. She also stated that Agent Stone was wearing a T-shirt and jeans, nothing that would identify him as an employee of the Immigration Service. Chiszar clarified

that there were no "be-on-the-lookouts" for Guerra's vehicle and that there were no outstanding warrants for his arrest.

On redirect examination, Chiszar testified that, in connection with a previous job in law enforcement, she had training regarding terrorism and human trafficking. She stated that she had been trained to watch for such things as unusual driving, slow driving, and stopping of a vehicle. She noted that Agent Stone, although not wearing a uniform, was wearing a badge on his belt. She also mentioned that Agent Stone's vehicle was equipped with lights and a siren. Chiszar noted that, when she noticed Guerra's vehicle near the Abundant Life Church, there were ten to fifteen children outside playing.

René Arturo del Villar, Chiszar's husband, testified that he is an agent with the United States Border Patrol. He indicated that Guerra's vehicle drew his attention because it was the only vehicle in the lot adjacent to the office of Mark Payne and Absolute Dance. He said that the driver of the vehicle was looking multiple times at the Alpha Cheer Dance and Miller's Gymnastics building. He described the vehicle as being silver. He said that, after leaving the parking lot, Guerra was driving very slowly, about five to ten miles per hour. He noted that the driver was observing some children in the area of Miller's Gymnastics and Alpha Cheer Dance.

Del Villar said he followed the vehicle and, upon checking its registration, learned that it was registered in Big Spring, Texas. He noted that, at one point, he saw the driver of the vehicle on the side of the road watching four or five children, ages ten to fourteen, who were at the Abundant Life Church.

Del Villar testified that, after he and the vehicle had both returned to the parking lots where they had started, he got out of his vehicle and faced the other vehicle. He indicated that the other driver flashed his lights on and off at him. He said that, after his wife had contacted Agent Stone, he pointed out the other vehicle. He related that, when he pointed out the vehicle, it exited the parking lot at a faster rate of speed than it had entered. According to del Villar, Agent Stone got in his vehicle and chased down the vehicle or tried to catch up.

Del Villar testified that, when he talked to Guerra after Guerra had been stopped by Agent Stone, Guerra told him that he was in the area looking for houses because he was thinking of moving his family from Big Spring. He said Guerra said nothing when he asked him what houses he was looking at in that industrial area. He indicated that, when Agent Stone asked Guerra what he was doing in the area, Guerra said he was looking for Midland Christian

4

Academy. Del Villar testified that, to his knowledge, there is no such school in Midland. He identified Guerra as the individual stopped by Agent Stone.

Del Villar testified that he observed a bag containing condoms, a map, and some pills in Guerra's vehicle. He noted that he also saw a jacket with duct tape on both arms. Del Villar acknowledged that, in his written report, he did not mention there being any children in the area of Alpha Cheer. He acknowledged that Guerra did not approach the children, call out to the children, motion to them as if he wanted them to approach him, or interact with them in any other way. He also acknowledged that he did not mention in his written report that Guerra flashed his lights on and off. He insisted that he never arrested or detained Guerra in any way.

Agent Stone testified that he is employed with Homeland Security Investigations and is a federal law enforcement officer. He said he was working late on April 28, 2010, when he answered Chiszar's knock at the door. He indicated that Chiszar was very upset by something outside. Agent Stone confirmed that the driver of the vehicle Chiszar was concerned about turned his lights on del Villar either to illuminate or blind him and that the vehicle started leaving when Chiszar pointed out the vehicle to him.

Agent Stone testified that a female agent had recently been followed after she had left the office. He also said that drug trafficking from Odessa to Big Spring by members of the Mexican Mafia involved a light-colored Toyota, which matched the description of the vehicle that was concerning Chiszar.

Agent Stone testified that he pursued the vehicle after it left the parking lot. He indicated that, when the vehicle got halfway or more down the alley, he activated his red and blue emergency lights. According to Agent Stone, the vehicle did not stop immediately but continued to move very slowly. Agent Stone related that the vehicle stopped when it reached the end of the alley.

Agent Stone testified that, after he stopped Guerra and exited his vehicle, Guerra's vehicle started edging forward. He stated that, after he got back into his vehicle, Guerra stopped again. He related that after telling Guerra, in response to a question, that he was a cop, Guerra did not walk directly back to Agent Stone's vehicle as Agent Stone had requested, but moved away from his own vehicle, out of the lights, and was peering back with his eyes covered as if looking to see where Agent Stone was actually standing. Agent Stone stated that he felt like a target at that time.

5

Agent Stone testified that, while talking to Guerra, he noticed two metal prongs, which he recognized as a stun gun or Taser, sticking out of Guerra's shirt pocket. He indicated that was a weapon commonly used in abductions. He identified an exhibit as the stun gun. Agent Stone stated he instructed Guerra to put the stun gun on the top of his vehicle. He related that, when he asked Guerra if he had any other weapons, he said he had a pocket knife. Agent Stone said he instructed Guerra to place it on the hood as well.

Agent Stone testified he conducted a pat-down search on Guerra. He related that, as he reached Guerra's right front pocket, Guerra told him he had a gun. Agent Stone said he removed the gun from Guerra's pocket and secured it on his person. He indicated that, when Guerra admitted he also had a gun in his vehicle, he asked del Villar to watch Guerra while he retrieved the gun. Agent Stone related that, when he looked in Guerra's car, he found a jacket with duct tape on it. He said the jacket had a pocket with a holster for concealing a gun. Agent Stone testified he found a set of zip ties that were linked together to form what could be a handcuff in each of the front pockets of the jacket.

Agent Stone testified that he found a second stun gun in one of the jacket pockets, together with a set of plastic handcuffs. He noted that the strips of duct tape were in the shoulder area of the jacket, tabbed on the ends so they could easily be pulled off.

Agent Stone testified that, at this point, he thought Guerra was going to kidnap someone because of the way he was driving, the way he got out of his vehicle and tried to find him in the dark, his evasive answers about the weapons he carried, the fact that he had stun guns, the strips of tape and zip ties he possessed, the intelligence bulletins that had been received, and the fact that an agent had been followed from the office.

Agent Stone testified that he also found a backpack containing ropes and two sets of bungee cords with cotton or a sock or cloth fashioned around them. He indicated he found a plastic bag containing personal lubricant, a condom, and a pill bottle labeled Viagra. He agreed that the ropes were tied with a loop and knotting at each end, untied at one end. He said that the two bungee-cord items appeared to be gags, because of their design, taken together with everything else that was in the car. He indicated that he called for a Midland police officer because he thought that a kidnapping, rape, or murder was about to be committed.

On cross-examination, Agent Stone acknowledged that he is not a Texas peace officer, but as a special agent, he could arrest for state law felonies and immediate breaches of the peace.

6

He further acknowledged that he had not seen Guerra commit either a felony or a breach of the peace. He admitted that he had no information that Guerra's vehicle was involved in following one of the female agents home and no information that the vehicle or Guerra had been involved in any kind of threat to the immigration office where he was working.

Agent Stone testified that he did not secure a search warrant prior to searching Guerra's vehicle. He indicated that zip ties can be used for something other than to handcuff or bind a person and that the lead pipe and ropes found could have a legal use.

James Rex testified that he is a patrol officer for the City of Midland. He indicated that he responded to the scene where a Border Patrol agent and an ICE agent had called for assistance with a subject who was armed. He identified the gags found in Guerra's car. He described both as a sock wrapped in duct tape that had a bungee cord through it so that the duct tape and sock would fit in someone's mouth. He indicated that Guerra could attach the bungee cord behind the head and that it would remain tight and prevent someone from talking, especially if their hands were tied.

Bill Anderson testified that he is a detective with the Midland Police Department. He described a DVD that he found in a trash can in Guerra's residence upon executing a search warrant, noting that it was entitled "Miss Junior Teen Beauty Competition." Detective Anderson described the video as depicting fully nude children.

Detective Anderson testified that, in his years of going to shooting ranges in the Midland area, attending shooting competitions, or just shooting for fun, he had never seen anyone hang a target with bungee cords.

He described a day planner that he found in Guerra's vehicle, noting that it contained a reference to 1K through 12, which he construed as a reference to school-aged children. He said the planner referred to "Alpha," which he described as a cheer and dance location.

Detective Anderson testified that the day planner also had directions from Alpha Cheer to a Midland residence where a young cheerleader lived. He said he learned that the young cheerleader attended Alpha for dance and cheerleading.

Donald F. Wills testified that he is a senior computer forensic examiner for the Federal Bureau of Investigation. He confirmed that he had been asked to search a computer belonging to Guerra for child pornography. He identified a picture taken from Guerra's hard drive showing a

7

young female bound and gagged.  Wills stated that he also found on Guerra's computer a picture of a young girl tied and stretched out in a bed, a picture that had been viewed on the internet.

We find that the evidence is sufficient to support Guerra's conviction because a rational jury could have determined that Guerra possessed the gag that we have described with the intent to use it in the commission of either the offense of aggravated kidnapping or aggravated sexual assault.  Guerra contends that the evidence is insufficient because the gag attached to a bungee cord that was found in his possession could also have had a legal use, that of holding a target at a shooting range.  He relies upon the opinions of *Ex parte Andrews*, 814 S.W.2d 839, 841 (Tex. App.—Houston [1st Dist.] 1991), *pet. dism'd, improvidently granted, sub nom.*, *Ex parte Chunn*, 831 S.W.2d 326 (Tex. Crim. App. 1992); *Danzi v. State*, 101 S.W.3d 786, 790 (Tex. App.—El Paso 2003, pet. ref'd); and *Eodice v. State*, 742 S.W.2d 844, 846 (Tex. App.—Austin 1987, no pet.).

We find each of those cases to be distinguishable.  *Ex parte Andrews* was a pretrial habeas corpus review in which the court determined whether the indictment against Andrews lawfully charged a Penal Code violation.  *Ex parte Andrews*, 814 S.W.2d at 840.  The defendant and others had entered an abortion clinic with bicycle locks and chains.  *Id.*  The protesters wrapped the chains around their necks and locked themselves together, with the chains and locks in a position that could result in injury to them should they be moved.  *Id.*  The indictment alleged that Andrews adapted and set up a criminal instrument by locking herself to others with a bicycle lock.  *Id.* at 841.  Holding that the context of its use was not relevant to its determination, the court concluded that the mere locking of a bicycle lock does not constitute a special adaptation of the lock as required by the pertinent section of the Texas Penal Code.  *Id.* at 842. The court concluded that, because using a particular object in a criminal episode is not in itself an adaptation of that object within the meaning of Section 16.01 of the Texas Penal Code, the indictment was defective because it alleged an act outside the purview of the criminal statute.  *Id.* Unlike the mere use of the bicycle lock in *Andrews*, the case at bar involved the adaptation of a sock and bungee cord into a gag.

In *Danzi,* the defendant's car was searched after a K-9 unit dog alerted on the vehicle. *Danzi*, 101 S.W.3d at 787.  Officers found a slim jim in the trunk of the car.  *Id.*  A testifying officer characterized the slim jim as a criminal instrument frequently used to conduct burglaries of motor vehicles.  *Id.*  Despite the officer's testimony, the court found the evidence insufficient,

apparently on the basis that there was no evidence of the slim jim's design. *Id.* at 794. In doing so, the court noted that the fact that an object is frequently used in crime does not equate with proof that it was specially designed, made, or adapted for that purpose. *Id.* at 793. The case at bar did not involve a common tool that had not been adapted. Instead, it involved an adaptation of common items, a sock and a bungee cord, into what was identified as a gag. We do not know of any lawful purpose of a gag, which is defined as something thrust into a person's mouth to prevent speech or outcry. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 511 (11th ed. 2004).

In *Eodice*, the court held that the evidence was insufficient because there was no evidence to show that a circuit tester possessed by the defendant had been specially designed or specially made for use in the commission of burglary. *Eodice*, 742 S.W.2d at 846–47. As we have already noted, the case at bar did not involve a common tool that had not been adapted for criminal purposes.

Guerra seems to suggest that, even though there is evidence to show that common items have been adapted into what can reasonably be determined to be a criminal instrument, the evidence is insufficient to support such a finding where there is evidence of another possible use for that item. None of the cases to which he refers us supports his contention. He refers us to evidence showing his using the device to hold up a bottle as a target at a shooting range, but does not refer us to anything in the record explaining why a sock or cloth would be necessary for the purpose of holding up a bottle as a target. Where, as here, there is evidence that common items have been specially adapted for the purpose of committing a crime, the fact that they could arguably also be used for legal purposes does not render the evidence insufficient. Whether the item was specially adapted for use as a gag or as a target holder was a matter for the jury to determine.

In *Fronatt v. State*, 543 S.W.2d 140, 142 (Tex. Crim. App. 1976), the Texas Court of Criminal Appeals, quoting with approval the opinion in *Universal Amusement Co. v. Vance*, 404 F. Supp. 33 (S.D. Tex. 1975), *vacated in part on other grounds sub nom.*, *Butler v. Dexter*, 425 U.S. 262 (1976), suggested that the criminal instrument statute was designed to deal with a very small class of property that can be used only for the commission of crime. 543 S.W.3d at 142. However, since the commission of the offense in *Fronatt*, Section 16.01 of the Texas Penal Code has been amended to exclude items whose possession is made unlawful by statute. *See* Act of

June 2, 1975, 64th Leg., R.S., ch. 342, § 7, 1975 TEX. GEN. LAWS 913. It has been suggested that, after that amendment, no lawfully possessed property could qualify as a criminal instrument because it is almost impossible to conceive of an object that may be lawfully possessed but has no legitimate use. *See Janjua v. State*, 991 S.W.2d 419, 424 (Tex. App.—Houston [14th Dist.] 1999, no pet.). In *Fronatt*, the court was interpreting the pre-amendment definition of the term and has had no further occasion to construe the term since the amendment. *Id.* In light of the language in the amended statute, we reject Guerra's contention that the evidence is insufficient to support his conviction. We overrule Issue Two.

Guerra urges in Issue One that the trial court erred by denying his motions to suppress evidence obtained from the initial stop of his vehicle and his subsequent detention. We review the trial court's ruling on a suppression motion for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). We review the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement. *Id.* We are to sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* We give almost total deference to a trial court's express or implied determination of historical facts and review de novo the trial court's application of the law of search and seizure to those facts. *Id.*

Guerra asserts that Agent Stone, the federal officer who stopped him, had no lawful basis for arresting or temporarily detaining him on the occasion in question. The State, while acknowledging that Agent Stone was not a peace officer, asserts that, as a federal officer, he had the right to detain Guerra because he had the power of arrest, search, and seizure as to felony offenses under the laws of the State of Texas based on Article 2.122 of the Texas Code of Criminal Procedure; because he had the right as a peace officer, based on Article 14.03 of the Texas Code of Criminal Procedure, to arrest; and because, as a private citizen, he was authorized by Article 14.01 of the Texas Code of Criminal Procedure to act to protect against a breach of the peace.

We will first consider whether Agent Stone, who is not a Texas peace officer, had the authority to temporarily detain Guerra, based on the authority granted in Article 2.122 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 2.122 (West Supp. 2012). Article 2.122 provides that, while a special agent of the United States Immigration and Customs Enforcement is not a Texas peace officer, such an agent shall have the powers of arrest, search,

10

and seizure under Texas law as to felony offenses only. *Id.* A Texas peace officer's power to arrest without a warrant is set forth in Article 14.03(a) of the Texas Code of Criminal Procedure, which includes the right to arrest persons found in suspicious places and under circumstances that reasonably show that such persons have been guilty of some felony or threaten or are about to commit some offense against the laws. TEX. CODE CRIM. PROC. ANN. art. 14.03(a) (West Supp. 2012). Construing Articles 2.122 and 14.03 together, we conclude that Agent Stone would have had the authority under these provisions to arrest or temporarily detain Guerra if he were found in suspicious circumstances that reasonably showed that he was guilty of some felony or threatened to or was about to commit some felony.

As previously noted, Agent Stone was aware that there was a vehicle whose presence was upsetting to Chiszar; he knew that the vehicle's driver had flashed his lights on del Villar, either to illuminate or blind him and that the vehicle started leaving when Chiszar pointed out the vehicle to him; he was aware that a female agent had recently been followed after she had left the office; and he knew that drug trafficking from Odessa to Big Spring by members of the Mexican Mafia involved a light-colored Toyota, the same type of Toyota Guerra was driving.

In determining whether Agent Stone had a reasonable basis for temporarily detaining Guerra, we consider the totality of the circumstances surrounding the incident. *Dickey v. State*, 716 S.W.2d 499, 503 n.4 (Tex. Crim. App. 1986). Circumstances under which a temporary detention is allowed must be such as to distinguish the activity of the detained person from that of any other citizen and must be based on an objective perception of events rather than the subjective feelings of the detaining officer. *Id.* In order to justify the intrusion, the law enforcement officer must have specific, articulable facts, which in the light of his experience and general knowledge, together with other inferences from those facts, would reasonably warrant the intrusion on the freedom of the citizen detained for further investigation. *Id.* Even in the absence of bad faith, detention based on a mere hunch is illegal. *Id.* There must be a reasonable suspicion by the law enforcement officer that some activity out of the ordinary is occurring or had occurred, some suggestion to connect the detained person with the unusual activity, and some indication that the activity is related to crime. *Id.*

The trial court made extensive findings of fact in connection with Guerra's motion to suppress. These findings dealt with the nature of the work for the United States Government done by Chiszar, del Villar, and Agent Stone; the suspicious nature of Guerra's car being parked

at night near their office at a deserted parking lot adjacent to businesses that were closed; the suspicious nature of Guerra's driving slow while paying attention to children who were in the area where he was driving; the fact that Guerra's car was registered in Big Spring; the fact that ICE was investigating a drug-trafficking organization that was distributing narcotics to people in Big Spring; the fact that the people in Big Spring were members of the Mexican Mafia; the fact that one of the individuals involved in such a transfer of narcotics had been observed in a light-colored Camry; the fact that an employee of ICE had previously been followed home; the fact that Agent Stone was aware of "be-on-the-lookout" notices, or "bolos," advising of the danger of a large gang active in Midland; the fact that ICE had received bolos from the El Paso Sector Border Intelligence Center warning of an unconfirmed threat of retaliation against law enforcement officers; and the fact of the movement of Guerra's vehicle when the vehicle was pointed out to Agent Stone.

Guerra does not challenge any of these findings by the trial court, but argues generally that the facts were insufficient to justify Agent Stone's temporary detention of him. We hold that the evidence before the trial court, as found to be true by the trial court, constitutes a sufficient basis for Agent Stone to form a reasonable belief that Guerra was found in suspicious circumstances that showed that he was threatening or about to commit some felony offense. Consequently, Agent Stone had the authority to arrest or temporarily detain Guerra by virtue of being a federal agent. We overrule Issue One.

Guerra insists in Issue Three that the trial court erred by denying him two requested jury instructions that he wished to be included in the court's charge at the conclusion of the guilt/innocence phase of his trial. He first requested that the term "criminal instrument" be defined in the charge as follows:

> "Criminal instrument" means anything, the possession, manufacture, or sale of which is not otherwise an offense that is specifically designed, made, or adapted for use in the commission of an offense. Anything which has a common, lawful use is not a criminal instrument. Further, the use of a particular object in a criminal episode does not constitute adaptation for the purposes [of] this charge.

He also requested the following instruction:

> An object does not become a criminal instrument by the context of its use but by the limited nature and specialized criminal use of its own distinctive properties.

12

The mere act of using a particular object in a criminal episode is not in itself an adaptation of the object within the meaning of Section 16.01.

The illegality to be proved is in the inherent characteristics of the object itself as adapted and not in the conduct of defendant in using the object within a particular criminal episode.

An object does not become a criminal instrument by the context of its use.

The trial court charged the jury:

A person commits the offense of UNLAWFUL USE OF A CRIMINAL INSTRUMENT if the person possesses a criminal instrument with intent to use it in the commission of an offense.

The term "criminal instrument" means anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense.

The trial court's charge tracks the statute with respect to the offense and the definition of criminal instrument. *See* Section 16.01(a), (b)(1). We find no error in the court's charge. Guerra contends that the language he wished to add to the charge was necessary because of confusion as to what constitutes a criminal instrument as discussed in the cases of *Ex parte Andrews*, *Danzi*, and *Eodice*. As we have previously noted, these cases were distinguishable from this case for the reasons we have stated. We hold that, whether Guerra's theory was that the device was fashioned to be a target hanger, as opposed to a gag, or whether his theory was that it was a gag that he occasionally used as a target hanger, the statutory instruction and definition, under the facts of this case, would not have caused any confusion. Consequently, Guerra's additions to the instructions and to the definition of "criminal instrument" were unnecessary and perhaps confusing themselves. We overrule Issue Three.

The judgment of the trial court is affirmed.

JOHN G. HILL

February 14, 2013                                                            JUSTICE

Publish. *See* Tex. R. App. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Hill.[1]

---

[1]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.