

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00095-CR

Jesus **PADILLA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 6, Bexar County, Texas
Trial Court No. 394254
Honorable Wayne A. Christian, Judge Presiding

Opinion by: Patricia O. Alvarez, Justice

Sitting: Patricia O. Alvarez, Justice
Luz Elena D. Chapa, Justice
Jason Pulliam, Justice

Delivered and Filed: June 17, 2015

REVERSED AND RENDERED

Appellant Jesus Padilla was charged with unlawful use of a criminal instrument. The jury returned a verdict of guilty and assessed punishment at one year confinement in the Bexar County Jail suspended and probated for a term of two years and a fine in the amount of $500.00. Padilla raises two issues on appeal: (1) the trial court erroneously allowed testimony based on speculation and (2) the evidence is legally insufficient to support the conviction. Because the State failed to present sufficient evidence that the instrument in question was specifically intended for use in the theft of copper, we reverse the trial court's judgment and render a judgment of acquittal.

## SUFFICIENCY OF THE EVIDENCE

### A.    Argument of the Parties

Padilla contends the State failed to present evidence establishing that Padilla possessed a criminal instrument with the specific intent to commit theft of copper.

The State counters that a rational jury could have concluded that the driver backed up the truck, with the modified winch, close to the power cables with the specific intent to steal copper wiring from its protective tubing.

### B.    Standard of Review

In reviewing the legal sufficiency of the evidence, an appellate court determines whether, viewing "all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *accord Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We defer to the jury's assessment of the credibility of the witnesses "and the weight to be given their testimony," *Brooks*, 323 S.W.3d at 899, and allow for reasonable inferences from the evidence presented. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 2013) (stating that "[t]he jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony" except where provided otherwise by law); *Jackson*, 443 U.S. at 319 (reiterating it is strictly the province of the jury "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). In so doing, an appellate court presumes that the jury "resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 326).

The key question is whether "the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams*, 235 S.W.3d at 750. Only upon a finding the evidence is legally insufficient will this court reverse the trial court's judgment and order an acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41 (1982). This legal sufficiency standard applies equally to both direct and circumstantial evidence. *Clayton*, 235 S.W.3d at 778; *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

## C. Unlawful Use of a Criminal Instrument

A person commits the offense of unlawful use of a criminal instrument if

> (1) [he] possesses a criminal instrument . . . with the intent to use the instrument or device in the commission of an offense; or (2) with knowledge of its character and with the intent to use a criminal instrument . . . or aid or permit another to use the instrument or device in the commission of an offense, the person manufactures, adapts, sells, installs, or sets up the instrument or device.

TEX. PENAL CODE ANN. § 16.01(a) (West Supp. 2014). A criminal instrument is defined as any object that is legal to possess, manufacture, or sell but "that is specially designed, made, or adapted for use in the commission of an offense." *Id*. § 16.01(b)(1). Importantly, a "'criminal instrument' 'is not restricted to objects that can be used *only* for criminal purposes.'" *Medina v. State*, 411 S.W.3d 15, 20 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (quoting *Janjua v. State*, 991 S.W.2d 419, 424 (Tex. App.—Houston [14th Dist.] 1999, no pet.)).

## D. Testimony at Trial

Only two witnesses testified during the trial. Both were officers with the San Antonio Police Department and were present on the night in question.

### 1. Officer Shawn King

The State's first witness, Officer Shawn King, had been a police officer with the San Antonio Police Department for three years. Officer King testified that on June 2, 2012, at approximately 4:00 a.m., he observed a vehicle driving into the parking lot of a Pittsburgh Paint

store. Based on the time of day and the closed business, Officer King drove into the parking lot where he located a female sitting in the driver's seat of a Mazda truck that was backed into a parking space.

When questioned, the driver claimed to be trying to locate a free dental clinic and that she was lost. Officer King noted the vehicle was running and the lights were off. After speaking to the driver, Officer King was surprised by a male individual, later identified as Padilla, "com[ing] out of the bushes" behind the truck wearing a hoodie and black shorts. Padilla explained he was "urinating in the bushes."

Officer King opined that he found it strange the female failed to mention the other individual prior to him walking out of the bushes. He also described the positioning of the vehicle as odd because it was "backed in to an area that had utility poles . . . [and] it looked like they were trying to hide." When asked to better describe the vehicle's placement, Officer King testified the vehicle was five to ten feet from the transformer.

Officer King pointed to several different events that raised his suspicions. First, the front license plate was missing from the vehicle and the back license plate was placed in the rear window, but was covered up with a manual. Second, the truck was backed into a parking space relatively close to the transformer box. Third, although several officers looked in the area from which Padilla emerged, they were unable to substantiate Padilla's story that he had been urinating. Finally, the bed of the truck contained a winch, operated by a stand-alone battery, which appeared to be modified for theft of copper; specifically, Officer King noted the winch's placement and that "it didn't appear to be a very professional job. It was kind of haphazard, you know, kind of welded in there." Based on the totality of the circumstances, and ten to fifteen previous investigations, Officer King believed Padilla and the female driver were attempting to steal copper.

In the last couple of years we've had a large issue with copper theft. People are using devices to pull the actual copper out of the tubings that the utilities place in there. The winch in the back of the truck, it was unspooled with a hook. The winch itself was modified to be placed in the rear of the truck with a standalone battery. Most winches are placed in the front or the actual very rear of the vehicle. The truck size itself, it's a small B2200, you know, Mazda pickup truck. It's not really capable of pulling anything, you know, weight-wise. It was adapted for a criminal element.

The State asked Officer King to explain how the winch could be used to steal the copper. He explained, "I felt like they were going to, you know, basically strip the copper out of the electrical boxes there." Accordingly, Officer King opined the winch was a criminal instrument that was adapted for the use in the commission of an offense—specifically copper theft. During cross-examination, Officer King conceded that although he was convinced the winch was welded to the bed of the truck for use in the commission of a crime, he had never seen a winch used in that manner or ever investigated a copper theft wherein a winch was utilized.

### 2. *Sergeant Richard Silva*

Sergeant Richard Silva, an officer with over twenty years of experience also testified. Sergeant Silva noted the early hour and that no businesses were open at that time. He described Padilla's vehicle as "backed up to the curb" and approximately ten to twelve feet from the electrical boxes. He also noted the license plate in the rear window of the vehicle was obscured.

When asked about the use of the winch, the officer explained the copper wiring comes out of the ground is literally just pulled out during the theft.

[The thieves] cut one end, and then they attach the closer end to whatever contraption they're using and they just pull the whole thing out and then wrap— you know, gather it up and they're off with it.

Sergeant Silva testified he was "100 percent confident" that Officer King thwarted a copper theft. Sergeant Silva's conclusion was based on the winch being "mounted and bolted in somehow to the bed of the truck, close to the cab, which is a very unusual place for a winch to be mounted"

and it was powered by a portable battery. Additionally, he opined the vehicle had no reason to be in the parking lot at that time of the night and the parties had conflicting stories as to why they were there. On cross-examination, Sergeant Silva also acknowledged that he had not been associated with any arrests involving the use of a winch to steal copper.

**E. Analysis**

We must determine whether the evidence is sufficient to support that the winch was specially adapted for committing the alleged theft of copper. We look at several courts for guidance and set forth detailed descriptions of the factual bases.

*1.* Eodice v. State

In *Eodice v. State*, 742 S.W.2d 844, 845–46 (Tex. App.—Austin 1987, no pet.), the Austin Court of Appeals was asked to determine whether the items in Eodice's possession amounted to a criminal instrument. At approximately 2:00 a.m., a police officer spotted Eodice standing in the doorway of a pawn shop that was not then open for business. *Id*. at 845. When the officer inquired about Eodice's heavy black leather gloves, Eodice told the officer that he used the gloves for driving. *Id.*

Upon further inspection, the officer found an assortment of tools, including a feeler gauge, a circuit tester, and a bent cotter pin in Eodice's vehicle. *Id*. The officer also discovered Eodice was carrying a military-style flashlight equipped with a red filter inside one of his socks and a fourteen–inch pry bar in the other sock. *Id*. In Eodice's wallet was a California "alarm agent" certificate. *Id*.

Based on testimony that the circuit tester could be used to disable a burglar alarm, and the feeler gauge, in combination with a cotter pin, the officer determined the cotter pin could be used as a lock pick. *Id*. at 847. The officer also testified that the cotter pin was bent into an "L" shape and was twisted in an unusual manner. *Id*. The court, however, concluded that based on the

- 6 -

statutory definition of criminal instrument, "the commission of a crime must be the object's primary purpose." *Id*. at 846. Because "there [was] no evidence that the circuit tester found in [Eodice's] car had been specially designed or specially made for use in the commission of burglary," the court concluded the evidence was not sufficient to support a conviction for use of a criminal instrument. *Id*. at 846–47.

### 2. Janjua v. State

Twelve years later, the Houston Court of Appeals addressed the issue of required proof for use of a criminal instrument. *Janjua v. State*, 991 S.W.2d 419, 422–26 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Janjua was charged with use of a computer adapted for the criminal promotion of child pornography. *Id*. at 421. The court explained:

> [W]hether a device is simple or complex, the gravamen of the crime remains the actor's *intended use* of the instrument. By definition, mere possession of the instrument is not an offense. Thus, the State must show by other facts and circumstances that the actor intended to use the device in the commission of an offense.

*Id*. at 425. The court further expounded the analysis requires examining both the "design or adaptation" and "facts and circumstances establishing its intended use." *Id*. at 426 (citing TEX. PENAL CODE ANN. § 16.01).

At some point during the proceedings, pursuant to a plea bargain with the State, Janjua admitted his guilt to the child pornography offense. *Id*. at 426. Based on nothing more than the affirmative finding of guilt, the court did not have to speculate on whether Janjua intended to use the computer to distribute child pornography. *Id*. Thus, the court concluded Janjua's intended use of the computer was uncontested and the evidence was, thus, sufficient to support the conviction for use of a criminal instrument. *Id*. at 426–27.

*3.*    Danzi v. State

In *Danzi v. State*, 101 S.W.3d 786, 787 (Tex. App.—El Paso 2003, pet. ref'd), Plano Police Officer Ronald Kress testified that, while "investigating an apparent burglary of a motor vehicle," he observed a vehicle traveling approximately ten to fifteen miles per hour in a thirty miles per hour zone. After failing to properly stop at a stop sign, Officer Kress pulled the vehicle over. *Id*.

Officer Kress immediately recognized Danzi, the driver, based on previous arrests for possession of criminal instruments. *Id*. In the vehicle, Officer Kress found a slim jim and items in the trunk were identified as stolen during the earlier burglary. *Id*. When asked, Danzi admitted that the items were stolen, but professed to buying the items from a friend who was "car-jacking." *Id*. at 788. Even in light of the items recovered from the burglary, the court concluded the evidence was legally insufficient to support that Danzi possessed the slim jim for use in a criminal offense because "[t]he only evidence that relates to this issue is Officer Kress's testimony that a slim jim is a 'criminal instrument[ ] frequently used to conduct BMVs, or burglary of motor vehicles.'" *Id*. at 793 (second alteration in original)

*4.*    Medina v. State

More recently, in *Medina v. State*, 411 S.W.3d 15, 17–18 (Tex. App.—Houston [14th Dist.] 2013, no pet.), the Houston Court of Appeals reviewed charges stemming from the potential theft of diesel fuel. When the officers arrived, one of the defendants was hiding inside a "makeshift platform welded to the frame of the truck" and "[t]he truck was parked directly over one of the underground diesel fuel storage tanks." *Id*. at 18. On the ground underneath the truck, the officers also located a pair of black gloves, a dirty towel smelling of diesel, a hammer, a flashlight, a fuel transfer pump chained to the truck's frame, a female connector located directly over the diesel tank's opening, the metal plate over the tank removed, the lid of the tank was "pried off," a six-foot hose inside the tank cover inserted into the open tank with a male connector on the other end.

*Id*. The officers noted "'extended' fuel tanks" welded together underneath the truck. *Id*. Finally, the officers noted a fuel tank welded to the truck's "headache rack" and two more fuel tanks underneath the truck with their original fill ports welded shut. *Id*. The court concluded a rational jury could determine beyond a reasonable doubt that the evidence supported "the truck contained several modifications or adaptations conducive to the criminal purpose of stealing diesel fuel" and the truck was parked directly over the opening to the underground fuel tank, the metal plate was removed, the tank lid was pried open, and a hose had been inserted into the tank. *Id*. at 20–21. Accordingly, the court found the evidence sufficient to support a conviction for use of a criminal instrument designed or adapted for use in a criminal offense. *Id*. at 24.

## E.      Conclusion

In the present case, both officers were adamant that Padilla was in the process of stealing copper and that the winch had been modified for such purpose. We do not question that the circumstances in which Padilla found himself were suspicious. The vehicle was in the parking lot of a closed business at 4:00 a.m. and was parked somewhere between five and twelve feet from the transformer box. The stories provided by the driver and Padilla did not match. The front license plate was removed and the back license plate in the back window was at least partially hidden by a manual. The winch was welded to the bed of the vehicle in a very unprofessional and strange manner and was powered by a separate battery.

Yet, we also note that Padilla was not in the possession of any stolen copper, *see Danzi*, 101 S.W.3d at 788, and the officers could not testify that the winch is commonly used in theft of copper, *see Medina*, 411 S.W.3d at 18 (mounted tanks commonly used to steal diesel); *Danzi*, 101 S.W.3d at 788 (slim jim used in burglary of vehicle); *Eodice*, 742 S.W.2d at 846 (circuit tester used to disable burglar alarms and feeler gauge with a cotter pin used as a lock pick). Additionally,

unlike *Janjua*, Padilla did not to admit either using or planning to use the winch to steal copper. *See Janjua*, 991 S.W.2d at 425.

Although the winch was clearly adapted for some purpose, based on the record before us, we conclude that a "rational trier of fact could [not] have found the essential elements of the offense beyond a reasonable doubt" to support that the winch was intended to be used in the theft of copper. *Hardy*, 281 S.W.3d at 421; *see also* TEX. PENAL CODE ANN. § 16.01. We, therefore, conclude that the evidence is legally insufficient to support Padilla's conviction and we reverse the trial court's judgment and render a judgment of acquittal.[1]

Patricia O. Alvarez, Justice

DO NOT PUBLISH

---

[1] Because we reverse and render a judgment of acquittal on Padilla's sufficiency of the evidence issue, we need not address the remaining issue on appeal.