**Affirmed and Memorandum Opinion filed August 8, 2013.**



In the

# Fourteenth Court of Appeals

### NO. 14-12-00384-CR

### LUIS MAYONADA-HURTADO, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Cause No. 11-DCR-056389A**

## M E M O R A N D U M   O P I N I O N

Appellant Luis Mayonada-Hurtado was convicted by a jury of unlawful use of a criminal instrument. On appeal, he argues that the evidence is legally insufficient to support the jury's guilty verdict. We conclude that the truck at issue was a criminal instrument and appellant set up that instrument with intent to commit a criminal offense and, therefore, we affirm. *See Medina v. State*, — S.W.3d—, No. 14-12-00383-CR, 2013 WL — (Tex. App.—Houston [14th Dist.]

August 8, 2013, no pet. h.) (companion case of appellant's co-defendant, Ariel Medina).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Luis Mayonada-Hurtado was indicted for the state jail felony of unlawful use of a criminal instrument, alleged to have been committed on or about January 28, 2010. Appellant was convicted by a jury, and the trial court assessed punishment at two years in jail.

At trial, Shams Faizullah, the owner of a gas station located in Fort Bend County, testified that he closed his station at approximately 10:30 p.m. on January 28, 2010. Due to prior occurrences of fuel theft, Faizullah had installed cameras at his station; he could watch the closed-circuit feed at his house. Shortly after returning to his house that evening, while watching his closed-circuit television, Faizullah observed a semi-truck park above an underground diesel fuel storage tank. Faizullah explained that the diesel tank opening consists of a metal plate, about twelve inches in diameter, which covers a five-inch-wide lid that directly feeds into the underground tank. Due to the prior fuel thefts, Faizullah had installed padlocks on the lid. He does not store any hoses in the tank. Faizullah observed one of the men go "around" the truck, and the other man go "under the truck." Faizullah believed a fuel theft was in progress and called the Stafford Police Department (SPD).

Officer Clark with SPD was the first to arrive at the scene in response to a call from dispatch regarding possible diesel fuel theft. Upon his arrival, Clark observed a man—later identified as appellant—sitting in the truck. The truck's hood was not up and its engine was running. Clark pulled his weapon and ordered appellant out of the truck. Officer Garcia with SPD arrived and assisted Clark in detaining appellant. Officer Pavlock with SPD then arrived at the scene. About

2

ten minutes later, Pavlock was investigating the underside of the truck with a flashlight and discovered a second man, Ariel Medina, hiding inside a makeshift platform welded to the frame of the truck. The police had to coax and pull Medina out from this platform. Medina was dressed in black from head to toe, had dirty hands, and smelled like diesel fuel.

The truck was parked directly over one of the underground diesel fuel storage tanks. The truck was not parked near the station's air and water pumps, nor were any hoses from those pumps connected to the truck. The US Department of Transportation (USDOT) and Texas Department of Transportation (TXDOT) numbers on the side of the truck were obscured by a magnet. Found on the ground underneath the truck were a pair of black gloves and a dirty towel "with like diesel on it." Police located a hammer and flashlight on the platform underneath the truck. Also underneath the truck was a fuel transfer pump chained to the truck's frame. The pump had a female connector, which was directly over the opening to the diesel tank. The metal plate over the tank was removed, and the diesel tank lid had been "pried off," with the padlocks still in place. Inside the tank cover, police discovered a six-foot-long hose. One end of the hose was inserted in the open diesel tank, and the other end had a male connector. The hose was not connected to the pump—Officer Koenig[1] with SPD testified they could have been connected "without a problem." In addition, underneath the truck were "extended" fuel tanks; "what [someone] had done was taken a fuel tank and taken another fuel tank, cut the ends off and put it together and welded them together." The area underneath the truck was obscured by a black mesh drape.

Inside the truck, police located a bill of sale, a key ring remote that operated

---

[1] Koenig was the last officer to arrive on the scene; he conducted the search underneath the truck and was the officer who "noted the connections."

3

the fuel pump, and a manual for the pump. The bill of sale indicated that Medina had owned the truck since July 2009. Behind the cab, welded to the truck's headache rack,[2] there was a fuel tank with a level indicator; this tank had a fill port at the top and a drain at the bottom. A city of Stafford employee with twelve years of trucking experience, the State's expert, testified that this modification was illegal according to TXDOT and "an explosion ready to happen." Also, the two "extended" fuel tanks located underneath the truck had their original fill ports welded shut. The State's expert stated that altering the original 150-gallon fuel tanks to hold over 900 gallons would not be considered "DOT safe." The State's expert indicated that he never modified any of his trucks with "extended" fuel tanks, a mesh drape, a fuel pump, or a fuel tank behind the cab. Located under the sleeper bed in the cab was a 3500-watt power inverter; its wires went down underneath the truck. The State's expert also indicated that, although many truckers use inverters to power small appliances while on the road, the most powerful inverter he had ever used was 750 watts.

Medina testified that he bought the truck "used" five or six months before the incident, and "was trying to fix the truck, so [he] could start working for [him]self." Medina indicated that the truck had an overheating issue and appellant had installed a radiator bypass in an attempt to fix it. Medina testified that the truck was overheating, and he and appellant pulled into the gas station to try and fix it that night. Medina admitted going underneath the truck with a flashlight to check for a leak, and claimed that the metal plate covering the diesel tank cover was still in place.

Appellant testified that he installed the radiator bypass, and then took

---

[2] A headache rack is a wall-like safety device installed behind the back of a truck's cab that protects against cargo entering the cab and injuring its occupants if the brakes lock up.

Medina's truck out for a "test drive" that night.  After he pulled into the gas station, appellant sent Medina underneath the truck to check the "A.C." line for a leak.  Appellant claimed the metal plate and diesel tank lid were in place when he drove the truck in; otherwise, he would have "run over them."  Both appellant and Medina denied installing the truck's modifications.

The jury found both appellant and Medina guilty of the charged offense.  On appeal, appellant presents the single issue of the legal insufficiency of the evidence supporting his conviction of unlawful use of a criminal instrument.

## II.    ANALYSIS

Appellant was charged with committing the state jail offense of unlawful use of a criminal instrument—i.e., on or about January 28, 2010, in Fort Bend County, Texas, appellant, did then and there, with knowledge of its character and with intent to use in the commission of an offense, namely, theft, intentionally and knowingly adapt or install or set up a criminal instrument, to wit: a truck that was specially designed, made, and adapted for use in the commission of said offense. The jury charge tracked the indictment.

A person commits unlawful use of a criminal instrument if "with knowledge of its character and with intent to use or aid or permit another to use in the commission of an offense, he manufactures, adapts, sells, installs, or sets up a criminal instrument."  TEX. PEN. CODE ANN. § 16.01(a)(2) (West 2011), *amended by* Acts 2011, 82nd Leg., ch. 814 (H.B. 2577), § 1.  A "criminal instrument" is defined as "anything, the possession, manufacture, or sale of which is not otherwise an offense, that is specially designed, made, or adapted for use in the commission of an offense."  *Id.* § 16.01(b).

In evaluating the legal sufficiency of the evidence, we must view all of the

5

evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because the factfinder views the evidence first-hand, the factfinder is in the best position to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *See id.*; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) ("[U]nlike the factfinder—who can observe facial expressions and hear voice inflections first-hand—an appellate court is limited to the cold record."). We presume that the factfinder resolved any conflicts in favor of the verdict and must defer to that resolution, as long as it is rational. *Jackson*, 443 U.S. at 326. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster*, 275 S.W.3d at 518.

Appellant contends that the record evidence is legally insufficient to establish the elements of a violation of section 16.01(a)(2). While appellant admits that the evidence is "highly damning," he argues that at the most it establishes the offenses of criminal mischief, and possibly attempted theft, attempted setting up of a "criminal instrument," and DOT and transportation code violations.[3]

## A. The evidence is legally sufficient to support that the truck is a "criminal instrument."

First, appellant argues that Medina's truck cannot be considered a "criminal instrument" because the truck has "both criminal and lawful uses" and commission of fuel theft is not the truck's "primary purpose." We conclude a rational jury could have determined beyond a reasonable doubt that the truck constitutes a

---

[3] We do not consider the appropriateness of what other potential offenses appellant should or could have been charged with when conducting our legal sufficiency review. *See Avery v. State*, 359 S.W.3d 230, 236 (Tex. Crim. App. 2012).

"criminal instrument." *See Medina*, —S.W.3d—, 2013 WL —, at * __.

## 1. A "criminal instrument" is not restricted to objects that can only be used for criminal purposes.

In *Janjua v. State*, 991 S.W.2d 419 (Tex. App.—Houston [14th Dist.] 1999, no pet.), we construed the meaning of "criminal instrument," as defined in section 16.01,[4] in the context of a forfeiture proceeding. This court explained that the term "criminal instrument" "is not restricted to objects that can be used *only* for criminal purposes." *Id.* at 424 (emphasis in original). In doing so, we expressly noted that *Fronatt v. State*, 543 S.W.2d 140 (Tex. Crim. App. 1976), does not control because the Court of Criminal Appeals was interpreting the pre-1975 amendment meaning of "criminal instrument." *Janjua*, 991 S.W.2d at 424. We also rejected an interpretation requiring that the item's primary purpose be the commission of an offense. *Id.* at 424–25 (discussing *Eodice v. State*, 742 S.W.2d 844, 846 (Tex. App.—Austin 1987, no pet.)). Instead, we concluded that "what constitutes a criminal instrument under Section 16.01 must be determined by both (1) its design or adaptation and (2) the facts and circumstances establishing its intended use." *Id.* at 426.

The *Janjua* court rejected the exact argument appellant attempts here: that the item (here, the truck) does not constitute a "criminal instrument" because it has legitimate uses. *See id.* at 426.[5]

---

[4] The *Janjua* court interpreted the same version of section 16.01 at issue here.

[5] Appellant urges that *Janjua* should be revisited en banc. However, absent a decision from the Court of Criminal Appeals or this court sitting en banc that is on point and contrary to the prior panel decision or an intervening and material change in the statutory law, we are bound by our prior panel decision. *See Sarmiento v. State*, 93 S.W.3d 566, 567 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (en banc) (noting how panel "was obliged by stare decisis to follow previous panel opinions").

## 2. The truck had been adapted to steal fuel.

Here, the evidence indicates that the truck contained several modifications or adaptations conducive to the criminal purpose of stealing diesel fuel.[6] *See Janjua*, 991 S.W.2d at 426. Installed underneath the truck were a pump designed specifically "for the transfer of fuel," extended fuel tanks that could hold more than three times the original volume, and a platform large enough to support a man lying down. A black drape had been added to conceal the underside of the truck. Inside the cab was a 3500-watt power inverter that could be used to run the pump and a remote that turned on the pump. In addition, the evidence indicates that the extended fuel tanks were not supplying the truck with fuel; an additional fuel cell welded to the truck's headache rack was being used as its fuel source.

Although the defense's trucking expert "speculated" that the extended fuel tanks possibly could be used for transporting farming chemicals, the State's expert indicated that the extended tanks and the fuel cell were illegal and unsafe adaptations for legitimate trucking purposes. Moreover, the USDOT and TXDOT numbers had been covered up. And Medina admitted he and appellant were not transporting any chemicals that night. It is up to the jury to resolve any conflicts in the evidence, and the jury is free to reject the defensive evidence. *Saxton v. State*,

---

[6] Even in the absence of *Janjua* as binding precedent, we would find appellant's cited cases distinguishable. *See Danzi v. State*, 101 S.W.3d 786, 793 (Tex. App.—El Paso 2003, pet. ref'd) (no evidence that alleged "criminal instrument"—a "slim jim"—had been specially designed to commit burglaries of motor vehicles); *Eodice*, 742 S.W.2d at 846–47 (no evidence that alleged "criminal instruments"—circuit tester, feeler gauge, and cotter pin—had been specially designed or made for use in commission of burglary). In contrast, courts have affirmed items as "criminal instruments" under section 16.01 where there is evidence of adaptations or modifications that render the item conducive to a crime. *See Guerra v. State*, 396 S.W.3d 233, 241 (Tex. App.—Eastland 2013, pet. granted) (evidence that homemade device consisting of sock and bungee cord had been specially adapted as gag for purpose of committing aggravated kidnapping or sexual assault); *Havelka v. State*, 224 S.W.3d 787, 788–89 (Tex. App.—Eastland 2007, no pet.) (propane tank modified by hole in it and soda bottle screwed into its top was "like the ones used to steal anhydrous ammonia" used in illegal manufacture of methamphetamine).

804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc). Despite protesting that they did not install them, both appellant and Medina admitted knowledge of all of the truck's modifications. In addition, appellant, who performed mechanic work on the truck, admitted that the truck could have been "made for use in the offense of theft."

### 3. The facts and circumstances indicate that appellant intended to use the truck to steal diesel fuel.

Likewise, the facts and circumstances of this case establish that the intended use of the truck was theft of diesel fuel. *See Janjua*, 991 S.W.2d at 426; *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."). The truck was parked directly over the opening to the underground fuel tank. Appellant was sitting in the truck's cab; police located a remote control and a manual for the pump, as well as a power inverter, in the cab. Medina remained hidden for several minutes after police audibly ordered appellant out by gunpoint. When police located and pulled out Medina, he was dressed entirely in black and smelled like diesel. Underneath the truck, the fuel pump's female connector was directly over the diesel fuel tank, the metal plate was removed and the tank lid had been pried open, and a six-foot-long hose with a male connector had been inserted into the tank. Finally, the State's expert explained that the legitimate purchase of diesel fuel does not involve putting a hose into the underground diesel tank.

In addition, inconsistent statements and implausible explanations are probative of wrongful conduct and are also circumstances of guilt. *Guevara*, 152 S.W.3d at 50. Appellant and Mayonada-Hurtado explained that they pulled into the closed gas station because the truck's engine was overheating. This

explanation was inconsistent with leaving the truck's engine running, not raising the hood, and parking far from the water pump. Further, the jury reasonably could have rejected appellant and Medina's proffered explanation that they allegedly were taking a "test" drive at close to midnight, in the rain, when the station was closed and no one else was around. *See id.* at 51. Nor did appellant and Medina advance any plausible explanation for how the metal plate and diesel tank lid came off during the time they were the only people at the station.

We therefore conclude, viewing the evidence in the light most favorable to the verdict, and drawing reasonable inferences therefrom, a rational jury could have determined beyond a reasonable doubt that the truck constitutes a "criminal instrument" for purposes of section 16.01. *See Jackson*, 443 U.S. at 319; *Medina*, —S.W.3d—, 2013 WL —, at * __.

**B. The evidence is legally sufficient to support that appellant "set up" the truck with the intent to use it to steal fuel.**

Next, appellant argues even if the truck constitutes a "criminal instrument," there was no evidence he played any part in manufacturing, adapting, selling, or installing the truck or any appurtenant device, so the only available manner or means of committing the offense required the State to prove that appellant "set up" the truck.[7] Appellant contends that the evidence of any "set up" is legally insufficient because the fuel pump may not have been operational, the hose found in the diesel tank was not connected to the inlet of the pump, and the extended fuel tanks were not connected to the outlet of the pump. Thus, according to appellant, the only way a defendant could be convicted of this offense under a "set up" theory is where every preparatory step required to commit the intended offense has been

---

[7] Because we conclude the evidence is legally sufficient to support that appellant set up the criminal instrument, we do not discuss the State's arguments that appellant adapted or installed the criminal instrument.

accomplished, but for the very last step. Essentially, appellant argues that he could only have been convicted if the police had shown up after the pump had been fully connected, but just prior to the pump being switched on. We cannot agree with appellant's overly narrow statutory interpretation of the term "set up." *See Medina*, —S.W.3d—, 2013 WL —, at * __.

Statutory construction is a question of law we review de novo. *Tapps v. State*, 294 S.W.3d 175, 177 (Tex. Crim. App. 2009). "'Under the canons of statutory construction, we are to construe a statute according to its plain language, unless the language is ambiguous or the interpretation would lead to absurd results that the legislature could not have intended.'" *Id.* (quoting *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008)). We focus on the literal text of the statutory language, reading it in context and construing it according to grammar rules and common usage. *Id.* (citing TEX. GOV'T CODE ANN. § 311.011(a)).

Appellant has not directed us to, and we have not located, any prior judicial construction of the term "set up." Nor does the Penal Code define the term "set up," so we turn to the common, ordinary meaning of that term. *See Olivas v. State*, 203 S.W.3d 341, 345 (Tex. Crim. App. 2006); *see also Clinton v. State*, 354 S.W.3d 795, 800–01 (Tex. Crim. App. 2011) (noting court's ability to consult standard dictionaries to determine "fair, objective meaning of an undefined statutory term").[8] In relevant part, Merriam-Webster's Collegiate Dictionary defines the verb "set up" as: "to place upright: erect"; "to assemble the parts of and erect in position"; or "to put (a machine) in readiness or adjustment for an operation." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1140 (11th ed. 2003).

---

[8] The term "set up" appears in only one other provision of the Penal Code, the prohibition against gambling promotion. TEX. PEN. CODE ANN. § 47.03 (West 2011) (individual commits offense by intentionally or knowingly setting up or promoting lottery for gain).

Thus, the basic requirement is that the individual perform some physical action—to place, to assemble, to put, or to erect. However, we cannot agree with appellant that the plain meaning of "set up" requires the "set up" of the "criminal instrument" be fully "accomplished," "properly" done, or "successful" for a defendant's conduct to fall within the statute. Instead, we conclude that the plain meaning contemplates a violation of section 16.01(a)(2) as long as a defendant takes an affirmative step to physically "set up" the "criminal instrument," whether the instrument is then completely ready or requires some additional adjusting to be used in the commission of an offense.

"[T]his plain-language construction does not lead to absurd results but rather accomplishes the purpose of the statute." *Spence v. State*, 325 S.W.3d 646, 651 (Tex. Crim. App. 2010). This interpretation—requiring a showing of some physical action in connection with or to the "criminal instrument" by a defendant but not necessarily completion of the instrument's "set up"—acknowledges "the preparatory nature of an inchoate offense" and that section 16.01 penalizes "incipient criminal conduct." *See Janjua*, 991 S.W.2d at 424.[9] In addition, this interpretation is consistent with section 16.01's inclusion as a distinct offense of possession of a "criminal instrument." *See* TEX. PEN. CODE ANN. § 16.01(a)(1), (c).

When analyzing legal sufficiency, we must keep in mind that jurors are permitted to "freely read statutory language to have any meaning which is acceptable in common parlance." *See Clinton*, 354 S.W.3d at 800 (internal quotation marks omitted). Thus, under the plain meaning of the term "set up," as long as a rational jury could determine, based on the evidence viewed in the light most favorable to the verdict, that a defendant performed some physical action

---

[9] Section 16.01 is included within Title 4 of the Penal Code as an "Inchoate Offense."

which could be construed as "setting up" the "criminal instrument," the evidence would be legally sufficient to support a conviction under section 16.01(a)(2).

Here, viewed in the light most favorable to the verdict, and drawing reasonable inferences therefrom, the evidence reveals multiple physical actions by appellant that a rational jury could find support his "set up" of the truck as a "criminal instrument" under section 16.01(a)(2). Appellant and Medina pulled into a gas station in appellant's truck. The driver, appellant, parked Medina's truck directly over the closed covering to the underground diesel fuel tank. Medina went underneath the truck. Appellant remained inside the cab, where the pump manual and remote, along with the power inverter, were located. Medina was eventually located underneath the truck, along with a hammer, a flashlight, and a dirty towel "with like diesel on it." When Medina was located, the metal plate was removed and, despite its padlocks, the tank lid had been "pried" off. A hose with a male connector had been inserted into the diesel tank, directly below a fuel pump containing a female connector.[10] In addition, when Medina was located, he smelled like diesel.

Medina admitted going underneath the truck with a flashlight, and attempting to check and fix the truck. Appellant admitted driving the truck to the station, parking it over the diesel tank cover, sending Medina underneath to check on the truck, keeping the engine running, and getting down from the truck to monitor Medina's progress. Moreover, the police testified regarding their

---

[10] The defense's trucking expert testified that the fuel pump shown in the State's evidence—a photograph taken at the scene on the night of the incident—had a different female connector than what he saw on the pump when he viewed it at the impound lot shortly before trial, and that the threaded female connector he saw on the pump would not fit the quick-connect male connector on the hose. However, he admitted that a quick-connect female connector on the pump would fit the quick-connect male connector on the hose, that the State's photograph depicted a quick-connect female connector, and that one did not have to actually connect the hose to the pump to verify connector compatibility.

13

interpretation of the evidence at the scene. Clark indicated that it appeared "some individual set up all this, the hose in the ground, the way it was connected." Garcia testified as to his conclusion that individual was Medina:

> The—at the time, everything that was presented to us on the scene, from everything that was there, the hoses, the vehicle, the gentleman under the truck, the tools that were found, the flashlight, the fact that he had diesel on him and was working with the gas intakes, reasonable to believe that he was the gentlemen [sic] that was under the truck.

During closing arguments, the State argued that appellant and Medina had "set up" the truck:

> They had the truck, perfect for committing theft, by their own admission, they weren't there transporting chemicals. They set it up, Mr. Mayonada[-Hurtado] was in the driver's seat when he drove there. He's surrounded by a remote control, an inverter, instructions of how to use it. He even gets out to check on Mr. Medina, at one point, he said. Mr. Medina is underneath the truck, pried open the gas cap. Maybe when he heard the police out there, he put the hose back in there, so it wouldn't be sticking out the side of the truck. At the very least, ladies and gentlemen, these two Defendants set this up and they intended to commit theft.

Based on all the evidence presented, viewed in the light most favorable to the verdict and drawing reasonable inferences therefrom, we conclude a rational jury could have found the essential elements of the offense, including that appellant's conduct in relation to the truck met the "set up" manner or means under section 16.01(a)(2), beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Clinton*, 354 S.W.3d at 803 (concluding evidence was legally sufficient to support manner or means that appellant "used" card under plain language of debit card abuse statute); *Medina*, —S.W.3d—, 2013 WL —, at * __. Therefore, we overrule appellant's sole issue on appeal.

### III.    CONCLUSION

Accordingly, we affirm the trial court's judgment.

/s/      Tracy Christopher
Justice

Panel consists of Justices Christopher and McCally, and Visiting Judge Thomas.[11]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[11] The Honorable Brock Thomas, Judge of the 338th Criminal District Court of Harris County, sitting by assignment pursuant to section 74.003(h) of the Government Code. *See* TEX. GOV'T CODE ANN. § 74.003(h) (West 2013).