**Affirmed and Opinion filed October 22, 2015.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### NO. 14-14-00758-CR

**EFRAIN LOPEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1428270**

## O P I N I O N

A jury convicted appellant Efrain Lopez of capital murder and assessed his punishment at life imprisonment. *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2014). Appellant contends that the trial court committed reversible error by (1) denying appellant's motion to dismiss the case for failure to provide a speedy trial; and (2) admitting an allegedly prejudicial photograph of appellant into evidence.

BACKGROUND

Appellant and three other men entered the home of Guadalupe Sepulveda on September 12, 2005, and stole jewelry, guns, marijuana, and cocaine. Sepulveda was wounded by gunfire during the incident and his brother, Daniel Zamora, was killed. Appellant and the three other men wore black clothes and gloves, and covered their faces. This incident, which forms the basis of appellant's conviction below, is referred to as the "Loma Vista" case because it occurred at 6401 Loma Vista Street.[1]

On December 16, 2005, appellant was arrested for an unrelated aggravated assault. A day after his arrest, appellant was indicted for a capital murder committed on Bunker Hill Road (the "Bunker Hill" case).[2] Appellant was represented by attorney Gerald Fry in the Bunker Hill case. Both the Bunker Hill case and the Loma Vista case were linked to the La Tercera Crips gang.

Appellant remained incarcerated from 2005 to 2011 pending trials in the aggravated assault and Bunker Hill cases. Appellant was indicted in the Loma Vista case on May 11, 2011. Joseph Salhab was appointed to represent appellant in the Loma Vista case on June 14, 2011.

Appellant filed a *pro se* motion for speedy trial on October 31, 2013, in which he contended that he was ready for trial in both the Bunker Hill and Loma Vista cases at all times. In an apparent reference to the Bunker Hill case, appellant

---

[1] The Loma Vista case originally was filed as Cause No. 1305940, and, upon reindictment, as Cause No. 1428270. Appellant was reindicted for the Loma Vista murder on May 9, 2014, to correct a mistake made in the original indictment. Originally, the indictment alleged that appellant caused the death of Zamora while in the course of committing and attempting to commit the robbery of Zamora. The new indictment alleged that appellant caused the death of Zamora in the course of committing and attempting to commit the robbery of Sepulveda.

[2] The Bunker Hill case was filed under Cause No. 1050629, and was still pending at the time appellant was convicted of the Loma Vista capital murder.

argued that his right to a speedy trial "began upon his arrest approximately three months prior to return of indictment." Before this motion was filed, however, appellant and Salhab signed eleven agreed resets in the Loma Vista case between June 14, 2011, and September 6, 2013,[3] with the final one setting the case for disposition on February 5, 2014.

Appellant filed a *pro se* motion to dismiss the indictment in the Loma Vista case for denial of a speedy trial on December 19, 2013. Appellant alleged that he was arrested for the Loma Vista case twice: first on October 10, 2005, after which he was released following a 24-hour hold, and again on December 16, 2005. Appellant argued that the delay could not be attributed to him or his counsel. Appellant further argued that the delay caused him to suffer oppressive pre-trial incarceration and anxiety, and compromised his ability to present his case due to lost evidence and unavailable witnesses.

Six agreed resets occurred in the Loma Vista case between February 5, 2014, and June 30, 2014, with the final one setting a trial date of August 29, 2014. Salhab filed a motion on August 29, 2014, to dismiss the Loma Vista indictment for failure to provide a speedy trial in which he adopted appellant's October and

---

[3] A twelfth agreed reset entered on January 24, 2013, and resetting the case for disposition on September 6, 2013, is not evidenced by a reset form in the record on appeal. However, the record includes the trial court's docket sheet, which reflects a January 24, 2013 entry stating "Reset By Agreement Of Both Parties, 9/06/2013 09:00 AM Disposition." The State asserts that "from December 13, 2011 until the day of trial, defense counsel had signed agreed resets," and appellant does not dispute this contention. We conclude that the record supports the existence of the January 24, 2013 agreed reset. *See Zamorano v. State*, 84 S.W.3d 543, 650 (Tex. Crim. App. 2002) (noting that the docket sheet reflected 22 resets); *McIntosh v. State*, 307 S.W.3d 360, 368 (Tex. App.—San Antonio 2009, pet. ref'd) (reviewing docket sheet entries as evidence that trial was reset); *see also Page v. State*, 690 S.W.2d 102, 103 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd) ("The trial docket sheet reflects a long and confusing list of resets. However, appellant and the state are basically in agreement as to the sequence of events prior to August 1, 1983.").

December 2013 *pro se* motions. A hearing on the motion to dismiss was held the same day.

At the hearing, defense co-counsel Deborah Summers argued that the passage of time since appellant's May 11, 2011 indictment in the Loma Vista case established a sufficiently prejudicial delay to trigger an analysis addressing whether appellant was denied his right to a speedy trial. *See generally Barker v. Wingo*, 407 U.S. 514, 530 (1972) (court must consider length of delay, reason for the delay, defendant's assertion of the right, and prejudice to the defendant).

The State called Spence Graham to testify at the hearing. Graham became felony chief prosecutor of the 179th District Court in May 2009 and was in charge of handling approximately 30 capital murder cases pending in that court, including appellant's Bunker Hill case.

After reviewing the evidence in the Bunker Hill case — which included evidence of other homicides and aggravated robberies linked to the La Tercera Crips gang — Graham concluded appellant was "worthy of being charged in the Loma Vista capital murder." Graham further testified that a search warrant was issued regarding the Loma Vista investigation, but that Graham held off filing charges against appellant in the Loma Vista case at Fry's request while plea negotiations were ongoing in the Bunker Hill case.[4] Graham testified that he and Fry did not want to jeopardize the potential Bunker Hill plea deal — which involved appellant agreeing to testify for the State in another capital murder case — by indicting appellant in the Loma Vista case.[5] Appellant was indicted in the Loma Vista case after the Bunker Hill plea negotiations broke down. Once the

---

[4] The record does not reflect when the search warrant was issued.

[5] Fry contradicted Graham's testimony at the hearing and denied asking Graham to refrain from filing the Loma Vista charges.

4

Loma Vista charges were filed and Salhab was appointed to represent appellant in that case, Graham had a lengthy discussion with Salhab "to get him up to speed." Graham further testified that the defense was not yet ready for trial when he left the 179th District Court in December 2011.

At the conclusion of the hearing, the State argued that it had been ready for trial at least since early March 2014. When the trial was set for July 2014, appellant was in quarantine for medical reasons and unable to appear. The State also claimed that Salhab did not want to try the case in July 2014 and had urged the trial court to reset the case. Salhab confirmed that appellant had been in quarantine and was unable to communicate with Salhab during the three weeks preceding the July 2014 trial setting. The trial court denied appellant's motion and trial was set for September 2, 2014.

A four-day trial was held beginning on September 3, 2014. The jury found appellant guilty of capital murder and assessed his punishment at life imprisonment.

## ANALYSIS

## I.     Right to a Speedy Trial

In his first issue, appellant contends that his Sixth Amendment right to a speedy trial was violated because he was incarcerated for eight years and nine months without a trial. Appellant argues that the trial court erred in denying his motion to dismiss the case because his right to a speedy trial attached when appellant became an accused. Appellant contends that he became an accused in the Loma Vista case when he was arrested on December 16, 2005.

5

## A. When Did the Appellant Become an Accused?

"[T]he Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,' . . . ." *United States v. Marion*, 404 U.S. 307, 313 (1971); *see Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). Generally, a person becomes an accused "once he is arrested or charged." *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). However, there may be instances where a person may invoke his right to a speedy trial prior to a formal indictment. *See Marion*, 404 U.S. at 320-21. A person must be an accused in the course of the prosecution for which he invokes his speedy trial right. *Marion*, 404 U.S. at 313.

Mere investigation of a crime is insufficient for a person to become an accused for purposes of the speedy trial right. *See Gonzales*, 435 S.W.3d at 812. The State is not required to discover, investigate, or accuse a person within any particular period of time. *Marion*, 404 U.S. at 313. In other words, "[t]here is no Sixth Amendment right to a speedy indictment." *State v. Kuri*, 846 S.W.2d 459, 464 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd)*, overruled on other grounds by Johnson v. State*, 954 S.W.2d 770 (Tex. Crim. App. 1997).

Appellant contends he became an accused in the Loma Vista case on December 16, 2005, when he was arrested for an unrelated aggravated assault, because (1) he was questioned by detectives regarding the Loma Vista case on December 16, 2005; (2) a co-defendant who was questioned on December 16, 2005, implicated appellant in the Loma Vista case; and (3) a "search warrant [was] executed in December of 2005 [that] related almost entirely to the facts investigators had uncovered in their investigation of the Loma Vista incident."

Evidence that appellant was questioned about the Loma Vista case, and that a co-defendant implicated appellant in that case, was not presented to the trial court

6

at the speedy trial hearing. Therefore, we cannot consider this evidence in assessing whether the trial court erred in denying appellant's motion at the hearing before trial. *See Hardesty v. State*, 667 S.W.2d 130, 133 n.6 (Tex. Crim. App. 1984) ("When appellate courts are asked to determine whether the trial court erred in overruling a pretrial motion the general rule is that we consider only evidence adduced at hearing on that motion and do not resort to testimony subsequently elicited at trial because the ruling in issue was not based on the latter."). In regard to the search warrant, appellant does not identify the facts investigators "uncovered in their investigation" or explain how these facts establish that appellant became an accused in the Loma Vista case on December 16, 2005.

At the speedy trial hearing, appellant acknowledged that the December 16, 2005 arrest occurred in connection with charges unrelated to the Loma Vista case; no contrary evidence was presented. This record does not establish that appellant became an accused in the Loma Vista case on December 16, 2005. Based on the record before us, we conclude that appellant became an accused in the Loma Vista case when he was indicted in that case on May 11, 2011.

We next address whether the trial court erred in denying appellant's motion to dismiss the Loma Vista case for failure to provide a speedy trial based upon the time that elapsed between the indictment in May 2011 and the trial in September 2014.

## B.    Speedy Trial Analysis

To trigger a speedy trial analysis, an accused first must allege that the interval between accusation and trial has crossed the threshold dividing ordinary delay from "presumptively prejudicial" delay. *Doggett v. United States*, 505 U.S. 647, 651-52 (1992). There is no bright-line rule for determining when a delay violates the right to a speedy trial. *Hull v. State*, 699 S.W.2d 220, 221 (Tex. Crim.

7

App. 1985); *Webb v. State*, 36 S.W.3d 164, 172 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). "[T]he length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31. The more serious and complex a crime is, the more tolerable a delay becomes. *Id.* at 531. "In general, delay approaching one year is sufficient to trigger a speedy trial inquiry." *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003); *see Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "[T]ime covered by agreed resets is to be excluded from speedy trial consideration." *Celestine*, 356 S.W.3d at 507 (citing *Caicedo v. State*, 769 S.W.2d 597, 598 (Tex. App.—Houston [14th Dist.] 1989, no pet.)); *see also Kuri*, 846 S.W.2d at 463 ("[A]greement to various resets is inconsistent with assertion of a speedy trial right.").

Once the length of the delay passes the required threshold and is determined to be presumptively prejudicial, the court must balance four factors set out in *Barker*, 407 U.S. at 530, to determine whether the right to a speedy trial was violated. *See Doggett*, 505 U.S. at 652. The factors are (1) length of delay; (2) reason for the delay; (3) defendant's assertion of the right; and (4) prejudice to the defendant caused by the delay. *Barker*, 407 U.S. at 530. The *Barker* factors must be considered together, rather than independently, to establish a violation of the right to a speedy trial. *Cantu*, 253 S.W.3d at 281; *State v. Wei*, 447 S.W.3d 549, 553 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).

The State must justify the length of the delay, while the defendant must establish assertion of the right and prejudice. *Cantu*, 253 S.W.3d at 280. "The defendant's burden of proof on the latter two factors 'varies inversely' with the State's degree of culpability for the delay." *Id.* "In reviewing the trial court's ruling on appellant's federal constitutional speedy trial claim, we apply a

bifurcated standard of review: an abuse of discretion standard for the factual components, and a *de novo* standard for the legal components." *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002). All of the evidence must be viewed in the light most favorable to the trial court's ruling. *Cantu*, 253 S.W.3d at 282.

Appellant argues the State failed to provide any direct evidence justifying the delay that occurred between January 2012 and the trial in September 2014. The State counters that "from December 13, 2011[,] until the day of trial, defense counsel had signed agreed resets. Hence these periods should be excluded from speedy trial consideration." Appellant does not dispute the State's assertion regarding the existence of agreed resets; instead, he urges us to disregard our precedent in *Celestine* and *Kuri* and include agreed resets in computing the length of the delay. We reject this invitation because we must follow our precedent absent an intervening decision from a higher court or from this court sitting *en banc*. *Medina v. State*, 411 S.W.3d 15, 20 n.5 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Appellant has identified no such decision that would allow us to depart from *Celestine* or *Kuri*. Accordingly, we exclude time attributed to agreed resets when assessing a speedy trial computation. *See Celestine*, 356 S.W.3d at 507; *Kuri*, 846 S.W.2d at 463.

As for the time period between appellant's indictment on May 11, 2011, and December 13, 2011, the record shows that only approximately two months are not attributable to agreed resets. The Court of Criminal Appeals has previously held that a period of approximately four months "could in no way be construed as 'presumptively prejudicial.'" *Pete v. State*, 501 S.W.2d 683, 687 (Tex. Crim. App. 1973). Accordingly, a two-month delay is insufficient to trigger a speedy trial analysis.

9

Moreover, even if we were to consider the State's apparent concession that the period between May 11, 2011, and December 13, 2011, was not covered by agreed resets, such delay would amount to approximately seven months.[6] A delay of seven months would not be considered presumptively prejudicial in light of this case's complexity. *See State v. Thomas*, 453 S.W.3d 1, 5 (Tex. App.—Dallas 2014, no pet.) (mem. op.) (seven-month delay was not presumptively prejudicial); *see also State v. Jones*, Nos. 05-05-00154-CR & 05-05-00155-CR, 2005 WL 2841210, at *1 (Tex. App.—Dallas Oct. 31, 2005, pet. ref'd) (not designated for publication) (same); *Rountree v. State*, No. 01-90-00382-CR, 1991 WL 84056, at *3 (Tex. App.—Houston [1st Dist.] May 23, 1991, no pet.) (not designated for publication) (same); *but see State v. Owens*, 778 S.W.2d 135, 138 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd) (seven-month delay was presumptively prejudicial for an ordinary street crime)*, overruled on other grounds by Johnson v. State*, 954 S.W.2d 770 (Tex. Crim. App. 1997).

Because the length of delay in this case is not a presumptively prejudicial delay, we need not conduct a *Barker* analysis. We conclude that appellant's right to a speedy trial was not violated. We overrule appellant's first issue.

## II.    Admission of Evidence

Appellant contends in his second issue that the trial court erred in admitting into evidence a photograph of appellant wearing a blue bandana and holding two shotguns while allegedly displaying a gang tattoo and a gang sign. Appellant

---

[6] This apparent concession by the State may simply be a misstatement. The State contends that "[f]rom December 13, 2011 on, defense counsel had signed agreed resets, right up until the day of the speedy trial hearing," and that "[t]he instant case shows that from December 13, 2011 until the day of trial, defense counsel had signed agreed resets." However, the State then cites to a number of agreed resets in the record in support of that contention, including five agreed resets covering the majority of the period between June 14, 2011, and December 13, 2011.

argues that the photograph was prejudicial and added no probative value to the State's argument.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403, 60 Tex. B.J. 1134 (1998, superseded 2015).[7] We review the trial court's decision to admit or exclude evidence under Texas Rule of Evidence 403 for an abuse of discretion. *Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006); *Burton v. State*, 230 S.W.3d 846, 849 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The admissibility of a photograph rests within the trial court's sound discretion and is based on a determination of whether the exhibit serves a proper purpose in assisting the factfinder. *Ramirez v. State*, 815 S.W.2d 636, 646-47 (Tex. Crim. App. 1991). An abuse of discretion occurs when the photograph has little probative value and great inflammatory potential. *Id.* at 647. The trial court is usually in the best position to determine whether evidence should be admitted or excluded. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). Unless the trial court's determination is so clearly wrong as to lie outside the zone within which reasonable persons might disagree, we must uphold its ruling. *Id.*; *Hartis v. State*, 183 S.W.3d 793, 801-02 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The balance between probative value and the potential for prejudice "is always slanted toward admission, not exclusion, of otherwise relevant evidence." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).

---

[7] The Texas Court of Criminal Appeals adopted revisions to the Texas Rules of Evidence, except as to Rules 511 and 613, effective April 1, 2015. *See* Final Approval of Amendments to the Texas Rules of Evidence, Misc. Docket No. 15-001 (Tex. Crim. App. Mar. 12, 2015). We cite to the previous version of Rule 403 because appellant's trial occurred in 2014, before the effective date of the amendments.

Additionally, a Rule 403 analysis must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

The indictment charges appellant with intentionally and knowingly causing the death of Daniel Zamora by shooting Zamora with a deadly weapon, namely a firearm, while in the course of committing and attempting to commit the robbery of Guadalupe Sepulveda. The record shows that the cause of Zamora's death was a shotgun wound and gunshot wounds to the torso and thigh. Sepulveda testified that one of the individuals who robbed him had a camouflage-patterned shotgun.

On direct examination, appellant's wife Yeni Rivas was shown two photographs, State's Exhibits 30 and 35. State's Exhibit 35 is a photograph date-stamped June 25, 2005, showing a group of men including appellant holding guns; some of the men depicted in State's Exhibit 35 display what appear to be gang signs. The photograph was not offered into evidence or shown to the jury. Exhibit 30 is a cropped version of Exhibit 35 depicting only appellant wearing a blue bandana and holding two shotguns. Rivas testified as follows:

> [THE STATE:] I want to show you what I've marked for identification as State's Exhibit 35. Do you recognize the individuals in this photograph?
>
> [RIVAS:] Yes, ma'am.

[THE STATE:] Is the defendant one of the individuals in this photograph?

[RIVAS:] Yes, ma'am.

[THE STATE:] On the date that this photograph was taken, were you at this location with the four people that are depicted in this photograph?

[RIVAS:] Yes, ma'am.

           *                    *                   *

[THE STATE:] And showing you what's been marked for identification purposes as State's Exhibit 30, is that a portion of that photograph?

[RIVAS:] Yes, ma'am.

[THE STATE:] And who is the individual depicted in that photograph?

[RIVAS:] That's [appellant].

[THE STATE:] Were you there then when that photograph was taken?

[RIVAS:] Yes, ma'am.

[THE STATE:] And the date of June 25th of 2005, does that date appear to be accurate to you as well, based on your memory of having been there?

[RIVAS:] Yes, ma'am.

State's Exhibit 30 was not offered into evidence at that time.

On cross-examination, Rivas testified that she had not seen appellant with a shotgun around the time of the Loma Vista murder. On redirect examination, Rivas testified:

13

[THE STATE:] You were asked on cross-examination whether you had ever seen the defendant with a shotgun before. I want to show you the photos again that I showed you yesterday, State's Exhibit 35, and then a portion of State's Exhibit 35 marked for identification as State's Exhibit 30. I believe you stated you were there at the time this photo was taken?

[RIVAS:] Yes, ma'am.

[THE STATE:] Now, was Alejandro Garcia at this location where this photo was taken at the time it was taken?

[RIVAS:] No, ma'am.

[THE STATE:] And I believe you stated yesterday that this was in fact [appellant] depicted here in the photograph?

[RIVAS:] Yes, ma'am.

[THE STATE:] And is that a fair picture? Is that what he was doing on that date, June 25th of 2005, when you were there at that location?

[RIVAS:] Yes, ma'am.

The State then offered State's Exhibit 30 into evidence over the defense's objection. In a bench conference outside the presence of a jury, the State argued that "the door was open[ed] when defense counsel asked [Rivas] if she had ever seen the defendant with a shotgun and she said that she had not." The trial court overruled the objection and admitted State's Exhibit 30 into evidence.

Appellant argues that State's Exhibit 30 lacked probative value because (1) the photograph was needlessly cumulative of Rivas's testimony that she remembered appellant in a photograph holding shotguns, and (2) the State put forth other evidence at trial that appellant had access to a camouflage-patterned shotgun like the one seen by Sepulveda at the time of the murder, and the photograph therefore was needlessly cumulative without direct evidence that the shotgun in the photograph was the same shotgun used to kill Zamora.

14

Appellant argues that the photograph added no probative value because "Rivas had already stated in front of the jury that she remembered that [a]ppellant had taken a picture holding shotguns in 2005." However, contrary to appellant's assertion, Rivas was asked only to identify who was in the picture — she was not asked what the person in the picture was doing or holding. In any event, photographs are generally relevant and admissible if verbal testimony as to the contents of the photograph is also admissible. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). This photograph was probative to clarify Rivas's testimony, which was muddied when Rivas testified on cross-examination that she had not seen appellant with a shotgun around the time of the Loma Vista murder. *See Cantu v. State*, 994 S.W.2d 721, 732 (Tex. App.—Austin 1999, pet. dism'd) ("The trial court may have determined that the [autopsy] pictures were probative to clarify the medical examiner's testimony."). The jury was not aware that Rivas's testimony contradicted what she saw the day before because the photographs had not been introduced or described. Introducing State's Exhibit 30 provided the jury context and clarified that Rivas had in fact seen appellant previously with a shotgun. The State took steps to eliminate any prejudicial effect from poses struck by others shown in State's Exhibit 35 by cropping State's Exhibit 30 so that only appellant was depicted.

Additionally, State's Exhibit 30 was relevant to corroborate Sepulveda's testimony that one of the assailants had a camouflage-patterned shotgun, and to provide evidence that appellant had access to a shotgun matching that description before the murder.

Appellant argues that State's Exhibit 30's prejudicial effect outweighed any probative value because it shows appellant wearing a blue bandana, exhibiting an alleged gang sign with his hands, and displaying a pitchfork tattoo, all signs of

gang membership. In analyzing the photograph, appellant's tattoo is too blurry to discern, which the trial court noted. In comparison to the other individuals in State's Exhibit 35, appellant's hands as shown in State's Exhibit 30 do not exhibit the same signal and do not appear to do anything more than hold two shotguns. Lastly, the presence of a blue bandana alone is not sufficiently prejudicial to outweigh the photograph's probative value.

The trial court's determination is not so clearly wrong as to lie outside the zone within which reasonable persons might disagree. Thus, we conclude that the trial court did not abuse its discretion by admitting State's Exhibit 30 into evidence. We overrule appellant's second issue.

## CONCLUSION

Having overruled both of appellant's issues, we affirm the trial court's judgment.


/s/   William J. Boyce
        Justice


Panel consists of Justices Boyce, McCally, and Donovan.
Publish — Tex. R. App. P. 47.2(b).

16